PETER R. MAYOCK *v.* MORGAN MARTIN, SUPERINTENDENT, NORWICH STATE HOSPITAL

KING, C. J., ALCORN, RYAN, COVELLO and SHEA, Js.

Argued June 5—decided July 23, 1968

*Joseph T. Sweeney,* for the appellant (plaintiff).

*Ernest H. Halstedt,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the appellee (defendant).

RYAN, J. In this application for a writ of habeas corpus, the plaintiff claims that his confinement in the Norwich State Hospital is illegal because his present mental condition does not require, nor does it legally justify, his involuntary confinement or custodial care. From the judgment dismissing the writ, the plaintiff has appealed.

The few corrections to which the plaintiff has shown himself entitled are incorporated in the following statement of facts found by the trial court: The plaintiff was first confined to the Norwich State Hospital in October, 1943, and was released in January, 1944. On July 23, 1944, the plaintiff removed his right eye and was recommitted but was released subsequently for a probationary period. On July 20, 1947, the last day of the probationary period, the plaintiff, after examination by a staff physician, was unconditionally discharged from the hospital. Three days later, on July 23, 1947, the plaintiff removed his right hand. Shortly thereafter, he was again committed to the state hospital, where he is still confined. The plaintiff runs the newsstand in the hospital's administration building, where he sells newspapers and magazines to employees and to patients of the hospital. In this operation, he has been entrusted with the handling of financial matters. He has been placed in charge of a recreation center for parole-privileged patients which is operated by a committee of patients for group-recreational activity on weekends and which also

serves coffee and performs other functions for patients. He believes sincerely that he is a prophet or revelator with a divine message. He believes in God and in doing what God wants us to do on earth. He also believes that society is trying to establish world peace by force but that God's way is by a brotherhood which seeks through the commandment of God to make people love one another; that world peace and brotherhood will be established by a certain church of God which the Old Testament refers to as being established by God in the latter days in the Holy Mountain; that, if the world continues in the present direction, many lives will be lost and that he has a responsibility in this matter; that he has a key role to fulfil in establishing world peace through the revelation and disclosure of the divine message; that he was not born into the country without a reason and that he was not born left-handed without a reason; that God has intended that one man shall be called to make a peace offering to God; that it is far better for one man to believe and accept an appropriate message from God to sacrifice an eye or a hand according to the sacred scriptures than for the present course of the world to cause even greater loss of human life; that the removal of his eye in July, 1944, was an offer of thanks to God for a revelation which he received and that it was God's command that he remove it; that the removal of his right hand in July, 1947, was an offering to God as a covenant between God and him as the person selected; that in each of these acts he has complied properly with sacred scripture; and that he is the one man called upon by God to make such spiritual sacrifices. The plaintiff has a strong belief in the Bible. Although he does not plan to cut off either of his feet or any other part of his

body, he admits that he would cut off his foot either as a freewill offering or in response to a revelation from the Lord. The plaintiff wants to be released from the hospital so that he can better express his divine message to our people and our policy makers.

The court also found as facts the following: When the plaintiff first entered the state hospital on October 2, 1943, his mental condition was diagnosed as dementia praecox, paranoid type, and this continued to be the diagnosis to the time of trial. This condition is manifested by what psychiatrists term the plaintiff's false beliefs regarding his role as a prophet, his divine message and the meaning of sacred scripture. These beliefs and the fact that he acted upon them by the removal of his eye and the amputation of his hand are the only factors which entered into the diagnosis that the plaintiff is mentally ill. Such beliefs were held by the plaintiff not only before these incidents but ever since then. Because of his persistent false beliefs without any observable improvement, it is expected that these beliefs will remain for a foreseeable period of time, and the possibility of a further self-injurious act cannot be ruled out. Although the possibility of suicide is ruled out, there is a possibility that the plaintiff might receive further communications from God and might respond by removing a foot. The mere medical diagnosis of dementia praecox, paranoid type, would not in itself require the plaintiff's confinement in a hospital for the mentally ill. In the opinion of the psychiatrist from the staff of the state hospital, the plaintiff is not dangerous to anyone other than himself. He has not done any self-injurious act in twenty years. The plaintiff's mental condition has remained about the

same since 1947; there is no evidence of a gross worsening of this condition. The fact that the plaintiff currently needs further confinement in a hospital for the mentally ill is based on the opinion of the psychiatrist that there is a possibility that the plaintiff might cut off his right foot. The plaintiff's religious beliefs are considered by the psychiatrist as "grandiose" and "grossly false" and represent a fantasy which is one of the primary symptoms of schizophrenic reaction, paranoid type. The plaintiff's removal of his right eye in 1944 and his right hand in 1947 were not the manifestations of a religious belief but indications of a mental illness. The mental illness from which the plaintiff suffered in 1947 still persists, and he is currently in need of further confinement in a hospital for the mentally ill.

The trial court reached the following conclusions: (1) The plaintiff is currently being held and involuntarily confined in the Norwich State Hospital. (2) During the entire period of his confinement, the plaintiff has been mentally ill with a condition known as dementia praecox, paranoid type. (3) This medical diagnosis is currently based on certain of the plaintiff's religious beliefs, upon which he acted self-injuriously twenty years ago. (4) The plaintiff sincerely professes these beliefs and attributes them to sacred scriptures and to certain divine revelations which he sincerely believes he has received from God. (5) If the plaintiff were to respond to a communication from God by removing one of his feet, such an act on his part would be inconsistent with the peace and safety of the state. (6) Neither the plaintiff's federal nor his state constitutional rights are being violated by his confinement in the Norwich State Hospital.

The plaintiff assigns error in the fifth and sixth conclusions of the trial court. The court's conclusions are to be tested by the finding and must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. *Johnston Jewels, Ltd.* v. *Leonard,* 156 Conn. 75, 79, 239 A.2d 500.

The plaintiff's basic claim is that he is being illegally confined because of his religious beliefs in violation of the first and fourteenth amendments to the United States constitution and of article first, §§ 3 and 20, of the Connecticut constitution. He urges that he is not likely to injure any other person; that, at the very worst, the state is concerned with a mere possibility that he will remove a foot; and that even if he did remove a foot, there is no evidence that the removal would prevent him from leading a useful and productive life.

Before any person alleged to be mentally ill may be committed to a hospital for treatment, our statutes require reasonable notice, a hearing, and, in addition to oral testimony offered at such a hearing, the sworn certificates of at least two reputable physicians selected by the court, one of whom shall be a practicing psychiatrist who is not connected with the hospital for mental illness to which application for the commitment is being made. "If, on such hearing, the court finds that the person complained of is mentally ill and a fit subject for treatment in a hospital for mental illness or that he ought to be confined, it shall make an order for his commitment to a hospital for mental illness to be named in such order, there to be confined while such mental illness continues or until he is discharged in due course of law." General Statutes § 17-178. A "mentally ill

person" includes "each person afflicted by mental disease to such extent that he requires care and treatment for his own welfare or the welfare of others or of the community." General Statutes § 17-176. The claim of the plaintiff that he is being confined solely because of his religious beliefs is not supported by the finding. It is common knowledge that the mental illness of many persons is associated with apparently fervent religious beliefs. The court found, on the basis of expert psychiatric evaluation, that the incidents wherein the plaintiff removed his eye and his hand were not manifestations of a religious belief but were symptoms of a mental illness which continued to exist to the date of trial.

The defendant urges that the essential question is whether the plaintiff is constitutionally entitled to act on his belief in any way he wishes and be adjudged sane and entitled to be released from the hospital even though his conduct places him, in the opinion of experts, in a class outside that of the standard of human conduct which is used to determine the need for confinement in a hospital for the mentally ill. The court's conclusion that the bizarre conduct of the plaintiff is inconsistent with the peace and safety of the state is amply supported by the finding of subordinate facts. Furthermore, the theory which the plaintiff asks this court to adopt overlooks the statutory definition of a mentally ill person which, under General Statutes § 17-176, is not limited to one who requires treatment for the welfare of others or the community but includes, as well, one who requires treatment for his own welfare.

Although the psychiatrist examining the plaintiff had never heard of anyone else who had a religious belief which caused the believer to do this kind of

damage to himself, and the trial court so found, the plaintiff insists that his confinement discriminates against him because of his religious belief. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts, —freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. It is equally clear that a State may . . . safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment." *Cantwell* v. *Connecticut,* 310 U.S. 296, 303, 60 S. Ct. 900.

84 L. Ed. 1213; see *Torcaso* v. *Watkins*, 367 U.S. 488, 81 S. Ct. 1680, 6 L. Ed. 2d 982; *Davis* v. *Beason*, 133 U.S. 333, 10 S. Ct. 299, 33 L. Ed. 637; *Reynolds* v. *United States*, 98 U.S. 145, 25 L. Ed. 244.

The conclusions of the trial court that the continued confinement for treatment of the plaintiff in accordance with statute is not illegal and that there has been no infringement of the rights accorded him by the constitution of the United States and the constitution of Connecticut cannot be disturbed.

There is no error.

In this opinion KING, C. J., ALCORN and COVELLO, Js., concurred.

SHEA, J. (dissenting). I agree with the majority that the interest of the state in preventing the plaintiff from dismembering himself is sufficient to justify his confinement, if it is necessary for that purpose. Such an offensive act is not exempt from governmental prohibition merely because it may be performed in the name of religion. Similarly, although in times less skeptical he might have been venerated as a saint or a prophet, the plaintiff gains no privilege before the law because his mental disease is manifested by delusions of religious rather than secular content.

Further confinement of the plaintiff as a mentally ill person under the statutory definition is warranted only if he is "afflicted by mental disease to such extent that he requires care and treatment for his own welfare or the welfare of others or of the community." General Statutes § 17-176. The diagnosis of dementia praecox, paranoid type, would not in itself require that the plaintiff be held in a mental hospital, as the trial court recognized. The extent of affliction from mental disease must be such

that care and treatment are required for his welfare or that of other persons.

The opinion of the psychiatrist that there is a possibility that the plaintiff might cut off his right foot is the sole basis for the conclusion that further confinement of the plaintiff is needed. The finding states also that "the plaintiff is not dangerous to anyone other than himself, and the latter danger is not a definite thing, in that it is only a possibility in the plaintiff's mind."

Almost anything can happen and is therefore possible. Consequently, some evaluation of the likelihood of a future occurrence has usually been insisted upon for judicial consideration. "Mere possibilities or suppositions will not sustain a legitimate inference of the existence of a fact nor can it be drawn by conjecture only." *General Petroleum Products, Inc.* v. *Merchants Trust Co.,* 115 Conn. 50, 58, 160 A. 296.

It is not suggested that the statutory criterion would authorize confinement of the plaintiff only in the event that the likelihood of self-mutilation amounts to a probability. Nor is it expected that the chances of such an occurrence can be forecast with mathematical precision. Nevertheless, to warrant a conclusion under the statute that the welfare of the plaintiff requires continued treatment in a mental institution, the risk of self-inflicted mayhem on his part ought to be substantially greater than for normal citizens engaged in the many hazardous pursuits of modern life. Perhaps the subordinate facts found, relating to acts performed by the plaintiff twenty years ago, would support such an inference, if it had been drawn by the trial court. A court of review, however, is limited to the finding, and here it is explicitly stated that the need

for confinement is based solely on the possibility that the plaintiff may harm himself upon release.

As between the possibility that the plaintiff may amputate his foot and the certainty that, under this judgment, he must remain incarcerated against his will indefinitely, I choose the former.

I would remand the case to the trial court for an additional finding or for a new trial if the evidence upon the point involved is insufficient to find the pertinent facts.

Accordingly, I dissent.