JANET I. M. HAMES *v.* HAROLD J. HAMES, JR.

HOUSE, C. J., RYAN, SHAPIRO, LOISELLE and MACDONALD, Js.

Argued June 6—decided September 20, 1972

*Gary I. Cohen,* for the appellant (defendant).

*Harold B. Yudkin,* for the appellee (plaintiff).

SHAPIRO, J. The plaintiff brought an action in three counts by writ dated October 28, 1970, seeking an annulment, a divorce and certain equitable relief. The defendant denied the validity of the marriage. Following a hearing on the plaintiff's motion for pendente lite custody of their minor children, support and alimony, the Superior Court found that the parties were legally married and ordered payment under the motion. The defendant appeals from these orders and attacks the court's determination that there was a valid marriage. *Hiss* v. *Hiss,* 135 Conn. 333, 64 A.2d 173.

The court found the following facts: The plaintiff and the defendant were members of the Roman Catholic Church and living in the town of Shelton where on February 3, 1955, they were married according to the rites of that church. On March 20, 1957, the plaintiff was granted a divorce in the Superior Court. In 1960, the plaintiff and the defendant agreed to remarry and they appeared before a Catholic priest and expressed their intentions to remarry each other. On November 17, 1960, they applied in Shelton for a marriage license which was issued by the public official there charged with that duty. On November 22, 1960, the defendant alone took the

license to a Roman Catholic priest of St. Joseph's Church in Shelton and told him that the plaintiff intended to marry him. The priest then signed the portion of the license entitled "Marriage Certificate" certifying that "Mr. Harold Joseph Hames, Jr. and Miss Janet Isabel Maloney . . . were legally joined in marriage by me at Shelton this 22nd day of November, 1960." He returned the certificate to the defendant, who had it recorded at the Shelton city hall. The plaintiff and the defendant resumed marital life on November 22, 1960, and as a result of that relationship have three children. At no time subsequent to the divorce of 1957 did the plaintiff and the defendant participate in a marriage ceremony. The court further found that it is basic canonical law of the Catholic Church that a marriage takes place once a man and a woman have appeared before a properly delegated priest and have exchanged consent in the presence of two witnesses; and that in a marriage so consummated, where the couple is later divorced under the state law but not divorced under the law of the Catholic Church, and where that couple wishes thereafter to be married again, once the parties have shown their agreement to begin cohabitation again, all that is necessary for Catholic celebration of such marriage is for the parties to obtain a new marriage license from the state, for the priest to sign it in the town where the license is permitted to be used and for the license to be filed with the issuing authority. According to canonical law the ceremony is simply the signing of the marriage license and that is the valid form and usage for solemnizing a marriage. According to canonical law the marriage license could be signed in the absence of one or both parties as long as they had shown that they intended to live together. The

court further found that, "[c]ivilly speaking, a second marriage such as in this case, is solemnized because of the acceptance of the canonical solemnity of the signing of the license by the properly delegated priest, which declares that these two people have entered into cohabitation again, acknowledging their previous marital contract before a priest and two witnesses. The Catholic Church does not call this remarriage. The church says the bond exists and the priest simply signs this license to cover the civil law to testify to the fact that this couple intends now to live together as man and wife."

The defendant limits his attack on the finding of facts to those findings that relate to the canonical law. A finding of a material fact may be attacked when it is not supported by the evidence. The validity of such a claim is tested by the evidence printed in the appendices to the brief. Practice Book §§ 645, 721; *Grodzicki* v. *Grodzicki*, 154 Conn. 456, 459, 226 A.2d 656.

The defendant filed no appendix to his brief. The appendix to the plaintiff's brief discloses that testimony regarding canonical law as given by the presiding judge of the Diocesan Court supports the finding made by the court.

The court overruled the defendant's claim of law that the marriage of November 22, 1960, was not a legal one and concluded that the union of the plaintiff and the defendant which occurred on November 22, 1960, was a marriage in accordance with the forms and usages of the Roman Catholic religion and therefore a valid marriage under General Statutes § 46-3; that the divorce of 1957 "legally separated the parties"; and that the intention of the parties in 1960 to remarry and the subsequent signing of the marriage certificate by the Roman Catholic priest,

whose religion does not recognize the legal divorce
of 1957, meets the requirement of General Statutes
§ 46-3 in that the marriage in 1960 was solemnized in
accordance with the forms and usages of the Roman
Catholic religion. These conclusions, which the de-
fendant attacks, are to be tested by the findings and
must stand unless they are legally or logically incon-
sistent with the facts found or unless they involve
the application of some erroneous rule of law mate-
rial to the case. *Covino* v. *Pfeffer,* 160 Conn. 212,
216, 276 A.2d 895; *Mayock* v. *Martin,* 157 Conn. 56,
62, 245 A.2d 574, cert. denied, 393 U.S. 1111, 89 S. Ct.
924, 21 L. Ed. 2d 808; *Commission on Human Rights
& Opportunities* v. *Veneri,* 157 Conn. 20, 23, 244 A.2d
401.

# I

The defendant's claim that the purported marriage
was invalid for want of a ceremony requires this
court to determine the elements indispensable to
valid marital status. To do this, we must look to the
statutory scheme regulating the performance of mar-
riages and, in particular, to General Statutes § 46-3.[1]

Marital status, of course, arises not from the sim-
ple declarations of persons nor from the undisputed
claims of litigants. *Perlstein* v. *Perlstein,* 152 Conn.
152, 156, 204 A.2d 909. It is rather created and dis-

---

[1] "[General Statutes] Sec. 46-3. WHO MAY JOIN PERSONS IN MAR-
RIAGE. All judges and justices of the peace may join persons in mar-
riage in any town and county in the state and all ordained or licensed
clergymen belonging to this, state or any other state so long as they
continue in the work of the ministry may join persons in marriage
and all marriages attempted to be celebrated by any other person shall
be void; but all marriages solemnized according to the forms and
usages of any religious denomination in this state, including marriages
witnessed by a duly constituted Spiritual Assembly of the Baha'is,
shall be valid."

solved only according to law. In this jurisdiction, common-law marriages are not accorded validity; *State ex rel. Felson* v. *Allen,* 129 Conn. 427, 432, 29 A.2d 306; for our statute has been construed to require the marriage contract to be entered into before authorized persons and with certain formalities which the state has prescribed. *Dennis* v. *Dennis,* 68 Conn. 186, 196, 36 A. 34.

We may observe at the outset, however, that for the purposes of the present litigation, it may be of little practical consequence whether the disputed marriage is valid or invalid. Section 46-28 of the General Statutes provides that the issue of any void or voidable marriage shall be deemed legitimate and permits the Superior Court to order alimony, custody and child support as it might in a divorce proceeding.[2] Hence, whether an annulment or divorce should be granted, the court below had indisputable authority to make the contested awards to the plaintiff; the relief provided in § 46-28 was plainly intended to cover situations where there was no valid marriage. *Stapleberg* v. *Stapleberg,* 77 Conn. 31, 35, 58 A. 233.

Since, however, the application of § 46-28 is in large part discretionary with the Superior Court, and since other rights may turn on how we characterize the marital relationship between the plaintiff and the defendant; *Yeager* v. *Flemming,* 282 F.2d 779

---

[2] "[General Statutes] Sec. 46-28. VOID MARRIAGES; ANNULMENT. ORDERS RELATIVE TO CHILDREN AND ALIMONY. Whenever from any cause any marriage is void or voidable under the laws of this state or of the state in which such marriage was performed, the superior court may, upon complaint, pass a decree declaring such marriage void, and may thereupon make such order in relation to any child of such marriage and concerning alimony as it might make in a proceeding for a divorce between such parties if married. The issue of any void or voidable marriage shall be deemed legitimate."

(5th Cir.), *Catalano* v. *Catalano,* 148 Conn. 288, 291–92, 170 A.2d 726; it is incumbent on this court to construe the relevant provisions of § 46-3 and to decide whether the purported marriage of November 22, 1960, was, as a matter of law on the facts, valid under the statute.

## II

There is no question that the divorce decree granted to the plaintiff in 1957 dissolved their previous marital status. Religious doctrines notwithstanding, the parties were legally divorced, not merely "legally separated," by force of a decree binding on all the world as to the existence of their status.[3] *Vogel* v. *Sylvester,* 148 Conn. 666, 670, 174 A.2d 122. In the eyes of the law, needless to say, a divorced pair could be but two single persons desirous of acquiring marital status. Thus, it is clear that no act whatsoever could have revested legal status in the previously terminated marriage. Hence, if the priest's conference with the parties and his subsequent signing of the marriage certificate was an attempt to "revalidate" the first marriage for legal as well as for religious purposes, our laws must deem his acts inconsequential. "A clergyman in the administration of marriage is a public civil officer, and in relation to this subject, is not at all distinguished from a judge . . . or a justice of the peace, in the performance of the same duty." *Goshen* v. *Stonington,* 4 Conn. 209, 218. Were this court to accord legal

---

[3] Compare § 46-29, governing legal separation, with § 46-13, governing divorce. Whereas parties legally separated may resume marital relations on filing a signed, witnessed and acknowledged statement with the clerk of the court, a legally divorced couple must undergo remarriage and prior to passage of the new penal code, General Statutes, Title 53a (effective October 1, 1971), would have been vulnerable to prosecution under § 53-219 (Rev. 1958).

effect to his acts, it would be in the curious—and unconstitutional—position of supplanting state power with ecclesiastical power. Obviously, even if canon law should deny the authority of the state to dissolve a marriage, religious doctrine could not nullify the decrees of our courts. U.S. Const., amend. 1, 14. The plaintiff, however, did not seek to circumvent the divorce decree. Instead, she prevailed on the theory that a second marriage was indeed "solemnized according to the forms and usages" of the Roman Catholic Church despite the fact that a ceremony was not performed. The basic question before this court is whether a marriage was validly solemnized in accordance with the requirements of § 46-3.

## III

It is urged that a second marriage was solemnized according to the forms and usages of the Roman Catholic Church pursuant to General Statutes § 46-3. In arriving at a determination of the minimum elements civilly required for a solemnization under the statute, we must imply, at the very least, the present manifestation or expression of the parties' consent before a religious group or functionary. Such a definition is necessary in order to give effect to the statutory provision, which promotes certainty and notoriety, and to sustain the distinction which we reaffirm between common-law marriages and marriages valid under our statutes. See *State ex rel. Felson* v. *Allen,* supra. "Some form of marriage promise, some ceremony, however slight, has always been deemed essential to the validity of marriage . . . . For the very definition of marriage implies that there should be not only the consenting mind, *but an expression* of the consenting mind, by words

or signs, which expression *in proper form* constitutes the marriage agreement." (Emphasis added.) 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th Ed.) § 40; see also *Respole v. Respole,* 34 Ohio Op. 1, 70 N.E.2d 465. Construing the statutory meaning of "solemnize" in a similar case, the court in *Pearson* v. *Howey,* 11 N.J.L. 12, 19, stated: "To solemnize means nothing more than to be present at a marriage contract, in order that it may have due publication, before a third person or persons, for the sake of notoriety and the certainty of its being made." Accord, *Dyer* v. *Brannock,* 66 Mo. 391.

Our statutory scheme specifies no precise form for the celebration of marriage; nor does it explicitly require that the parties declare that they take one another as husband and wife. Compare W. Va. Code § 4690 (2) (1961). No requirement is made concerning witnesses, but, like consent, the physical presence of the parties before an official is an implicit requirement to the performance of a marriage in this state. Compare, e.g., Mich. Comp. Laws § 551-9; see Howery, "Marriage by Proxy and Other Informal Marriages," 13 Kan. City L. Rev. 48, 58; note, 55 Yale L.J. 735, 738–48. Swift, in 1822, in discussing the predecessor statutes to our present § 46-3, remarked: "The law has not pointed out any mode in which marriages shall be celebrated, but has left it to the common custom and practice of the country. Any form of words which explicitly constitute a contract and engagement from the parties to each other, and published in the presence of, and by the officer appointed by the Statute, will be a valid marriage." 1 Swift, Digest, p. 20.

Under § 46-3, "all marriages attempted to be celebrated" by an unauthorized person "shall be void."

This prohibiting clause of § 46-3 was construed in *State ex rel. Felson* v. *Allen,* supra, 432, to carry "the necessary implication that no valid marriage is created where there is no celebration at all but merely an exchange of promises, or cohabitation under such circumstances as would constitute a common law marriage." In the *Felson* case, the court construed § 46-3 to invalidate marriages in which the only celebrants were the would-be spouses themselves—that is, where neither met the statutory criteria to act as the state's agent in performing the marriage. Implicit in this decision, however, is the proposition that a third party must witness or officiate at a ceremony wherein the parties each presently consent to marriage. Compare *Matturro* v. *Matturro,* 111 N.Y.S. 2d 533, 537.

## IV

We cannot ignore the irregularities in the purported solemnization in this case. After the parties had conferred with the priest and had expressed their intention to remarry, they procured a marriage license. Thereafter, the only effort expended to unite them in marriage was the unilateral act of the defendant, who brought the license to the priest for his signature. The plaintiff neither appeared at this point nor did she in any way participate in a ceremony. Although the priest apparently considered his signature on the certificate sufficient for legal marriage purposes, and in spite of his good faith effort to comply with the law, his signing of the marriage certificate cannot be deemed tantamount to a solemnization. The legal effect of his signature was merely to certify the performance of a marriage ceremony which should have preceded that signing but which in fact did not take place. This is the meaning dic-

tated by General Statutes § 46-7: "Each person who joins any persons in marriage shall certify upon the license certificate the fact, time and place of such marriage."

Plainly, even though the plaintiff appeared before the priest with the defendant at an earlier date, and even though she appeared with the defendant in obtaining the marriage license, her absence on November 22, 1960, prevented solemnization for the purposes of § 46-3 and precluded the parties from acquiring valid marital status.

It is not for this court to devise means of making marriage difficult. It is our duty, however, to recognize the law as it exists. See 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th Ed.) § 28 n.72.

## V

Having determined that the purported marriage in 1960 was invalid, we turn next to decide the legal effects of that invalidity. It has long been settled that unless a statute expressly declares a marriage to be void, as in the case of an incestuous marriage (General Statutes § 46-1), or one attempted to be celebrated by an unauthorized person (General Statutes § 46-3), deficiencies will render the marriage dissoluble rather than void. *Vendetto* v. *Vendetto,* 115 Conn. 303, 305, 161 A. 392; *Gould* v. *Gould,* 78 Conn. 242, 61 A. 604. Statutory deficiencies are, of course, to be distinguished from substantive defects such as lack of the consent which, even at common law, is deemed essential to forming the relationship. *Davis* v. *Davis,* 119 Conn. 194, 175 A. 574; *Allen* v. *Allen,* 73 Conn. 54, 46 A. 242. Even a bigamous marriage may carry sufficient legal effect to sustain an action for annulment. *Perlstein* v. *Perlstein,* 152

Conn. 152, 157–58, 204 A.2d 909. The policy of the law is strongly opposed to regarding an attempted marriage such as that in this case, entered into in good faith, believed by one or both of the parties to be legal, and followed by cohabitation, to be void. Keezer, Marriage and Divorce § 61.

Applying these principles, we hold that the purported marriage, deficient for want of due solemnization, was voidable rather than void, insofar as the latter term may imply an absolute nullity. This determination accords with the policies expressed in General Statutes § 46-28, under which the plaintiff may be entitled to an annulment and to relief normally incidental to a divorce. *Perlstein* v. *Perlstein,* supra; see also *Stapleberg* v. *Stapleberg,* 77 Conn. 31, 35, 58 A. 233.

There is error, the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion HOUSE, C. J., LOISELLE and MAC-DONALD, Js., concurred.

RYAN, J. (concurring). The fundamental question before the court is whether a marriage was validly solemnized in accordance with the requirements of § 46-3.[1] The parties had applied for, and secured, a marriage license in accordance with the provisions of § 46-5 (Rev. 1958) and if both of them

---

[1] "[General Statutes] Sec. 46-3. WHO MAY JOIN PERSONS IN MARRIAGE. All judges and justices of the peace may join persons in marriage in any town and county in the state and all ordained or licensed clergymen belonging to this state or any other state so long as they continue in the work of the ministry may join persons in marriage and all marriages attempted to be celebrated by any other person shall be void; but all marriages solemnized according to the forms and usages of any religious denomination in this state . . . shall be valid."

had been present with the priest as a witness on November 22, 1960, there could be no question as to the validity of the marriage. This, however, was not the fact. The majority opinion holds that the mere signing of the marriage license by the priest while the defendant was present but during the absence of the plaintiff prevented solemnization for the purposes of § 46-3 and, on the facts of this case, precluded the parties from acquiring a valid marital status. I agree that this is a proper legal conclusion.

Of major importance in the plaintiff's case was that portion of § 46-3 which provides that "all marriages solemnized according to the forms and usages of any religious denomination in this state shall be valid." For the purpose of establishing that a marriage was thus solemnized according to the forms and usages of the Catholic Church, and for that purpose only, an expert on canon law called by the plaintiff testified in considerable detail on the doctrine of the Catholic Church with reference to marriage and divorce. The findings of the trial court recited in the majority opinion describe the canonical law of the Catholic Church with reference to these matters. "Canon Law is the collected body of laws, rules and regulations enacted by the Roman Catholic Church concerning its constitution, its spiritual and temporal administration and the ecclesiastical government and discipline of the Catholic religious community. Just as the Catholic Church is a religious society distinct in its purpose from secular society, so Canon Law is distinct from the civil law. The former is concerned with the spiritual and moral welfare of the community, having as its final end the eternal salvation of souls; the latter treats temporal and secular interests, the preservation of peace and order, and the economic, social, political and

cultural life of the community. Canon Law includes only the law which the church has made for itself through its own legislative organs. The laws made by the state concerning the church and its institutions are not part of the Canon Law unless the church has adopted them and inserted them in its own legal system." *In re Soeder,* 7 Ohio App. 2d 271, 300, 220 N.E. 2d 547.

The findings express the beliefs and doctrine of the Catholic Church from a religious viewpoint only. They do not express the position of the church as to the civil effects of divorce. The majority opinion failed to recognize this as evidenced by the following statement: "Were this court to accord legal effect to his [the priest's] acts, it would be in the curious—and unconstitutional—position of supplanting state power with ecclesiastical power. Obviously, even if canon law should deny the authority of the state to dissolve a marriage, religious doctrine could not nullify the decrees of our courts. U.S. Const., amend. 1, 14." There is no finding which even suggests such a claim and nothing whatever to justify this statement. The Catholic Church does deny the right of the state from a religious viewpoint to dissolve a marriage as does the doctrine of other religious denominations. In any event, this is the exercise of a constitutional right as to a religious belief. The question in this case is not one, as suggested in the majority opinion, of supplanting state power with ecclesiastical power, nor does the record disclose any claim that canon law denies the civil effect of a divorce decree in a state court on a Catholic marriage or that religious doctrine can nullify the decrees of our courts. Statements of this kind suggesting a question of constitutional dimensions are gratuitous, unjustified and completely erroneous.

There are two basic errors on which this mistaken statement is predicated: First, the findings of fact based on the canon law of the church relate only to the position of the church from a religious viewpoint and each of the findings in question so indicates. Second, the majority opinion erroneously equates the religious beliefs of the Roman Catholic Church with the church's position as to the civil effects of divorce. The testimony of the expert on canon law, which has been completely ignored in the majority opinion, makes this crystal clear. He said: "The position of the Roman Catholic church is that the state has no right to dissolve marriages, Roman Catholic marriages or any marriages. The Catholic church does not deny the right of the State of Connecticut to require a marriage ceremony in order to create a marriage relationship between two Catholics who were formerly married to each other and were civilly divorced if it is in good order for the common good. In other words, the Church realizes that for the good order of society, it is necessary that the state interject itself with regard to recording of marriages, blood types and things like that. This is for health purposes or civil purposes in regard to the children that might result. The Church doesn't deny the right of the State to require a ceremony following a divorce. She acknowledges the fact that licenses are necessary."

It is traditional that this court has always used every effort to avoid any misrepresentation of the religious views of any religious denomination. It is regrettable that the tradition was not followed by the majority opinion in the present case.

I concur in the result.