**METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff,**

v.

**Edward MANNING, Defendant-Appellee,**

and

**Thomas Gaines, Jr., Defendant-Appellant.**

**No. 1181, Docket 77–7053.**

United States Court of Appeals, Second Circuit.

Argued June 10, 1977.

Decided Sept. 8, 1977.

Rehearing Denied Oct. 19, 1977.

Thomas Gaines, Jr., New Rochelle, N. Y., defendant-appellant Pro Se.

Steven Cohn, Carle Place, N. Y. (Dean & Falanga, Carle Place, N. Y., on the brief), for defendant-appellee Edward Manning.

Before FRIENDLY, TIMBERS and MESKILL, Circuit Judges.

TIMBERS, Circuit Judge:

At stake on this appeal from a judgment entered in the Southern District of New York, Charles H. Tenney, *District Judge*, adopting a report of Magistrate Harold J. Raby, are the proceeds of a $10,000 federal employees' group life insurance policy which was owned by the deceased, Irene Penn Manning, at the time of her death on September 28, 1975. The district court awarded the insurance proceeds to her second husband, Edward Manning. Her first husband, Thomas Gaines, Jr., appeals. We affirm, but on different grounds than those relied on by the magistrate and adopted by the district court.

## I.

Prior to their marriage on August 20, 1941, Irene had met Gaines in New Rochelle, New York, where the two resided separately. In the summer of 1941 they

travelled to Missouri to visit Gaines' family. Because Gaines' mother would not allow Gaines and Irene to stay at the family house together unless they were married, they went to Kansas City where they were married by a justice of the peace. After a further two weeks in Missouri, Gaines and Irene returned to New Rochelle where they took up residence together. In 1943 Gaines left his wife to take a war-related job in up-state New York. Shortly after Gaines left her, Irene moved to Bridgeport, Connecticut, where she had found employment. According to Gaines' testimony, he sent his wife no money. At Irene's request, Gaines visited her in 1947 or 1948, at which time Irene sought a reconciliation. Gaines refused. He never again visited or communicated with Irene.

Manning met Irene in the early 1950's when the latter lived in New York City and shared an apartment with Manning's sister. Later Manning and Irene both moved to Connecticut. They were married on December 31, 1956, by a minister in Montgomery County, Maryland. Thereafter they lived together in Connecticut until Irene's death. She had been employed by the Veterans Administration Hospital in West Haven since 1968. Incident to that employment she obtained the insurance policy here at issue. Manning testified that he learned of Gaines' existence only after Irene's death when the Veterans Administration informed Manning of Gaines' competing claim for the insurance proceeds.

Gaines testified that, although he never communicated with Irene following her unsuccessful attempt at reconciliation, he kept himself informed of her doings and whereabouts. He knew that Irene married Manning in 1956, that they lived together as husband and wife, that they eventually bought a house in their joint names in Stratford, Connecticut, and that they maintained a joint bank account. He also knew that Irene obtained employment with the Veterans Administration Hospital. He apparently also learned of her insurance, for he submitted to the Veterans Administration a claim for the insurance proceeds on the day after Irene's funeral.

Faced with conflicting claims for the life insurance proceeds, the group insurance carrier, plaintiff Metropolitan Life Insurance Company, instituted this interpleader action against Manning and Gaines in the Southern District of New York by depositing the policy proceeds with the clerk of the District Court. Judge Tenney on May 4, 1976 referred the matter to Magistrate Raby who, after a two day hearing, filed his report on October 6, 1976. Judge Tenney adopted the report. Judgment was entered in favor of Manning, from which Gaines now appeals.

## II.

The magistrate found that the 1941 marriage of Gaines to Irene had not been legally terminated when in 1956 Manning and Irene took vows of marriage. This finding was based on Gaines' testimony that he never had been divorced from Irene, and his further testimony that he had searched the records of Westchester County, New York, and Fairfield County, Connecticut, without finding any divorce decree naming him or Irene. The magistrate nevertheless concluded that Manning was entitled to the insurance proceeds. The magistrate recognized that Irene had not formally designated a beneficiary in her application for federal employees' group life insurance in accordance with 5 U.S.C. § 8705 (1970).[1] The application form indicated however that if

---

1. 5 U.S.C. § 8705 (1970) in relevant part provides:

"(a) The amount of group life insurance . . . in force on an employee at the date of his death shall be paid, on the establishment of a valid claim, to the person or persons surviving at the date of his death, in the following order of precedence:

First, to the beneficiary or beneficiaries designated by the employee in a signed and witnessed writing received before death in the employing office . . . . For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect.

Second, if there is no designated beneficiary, to the widow or widower of the employee. . . . ''

no beneficiary was designated the proceeds would be paid according to a statutory schedule which gave first priority to a widow or widower. Moreover on Irene's employment application forms she had indicated that Edward Manning was her "husband". The magistrate therefore found that, "[h]ad Irene been informed that in order to make absolutely certain that in the event of her death the proceeds of the policy would go to the person she designated as her 'husband' in her employment application, i. e., Edward Manning, she should have made a formal designation of beneficiary, she would have made such designation."

Relying on *Sears v. Austin,* 292 F.2d 690 (9 Cir.), *cert. denied,* 368 U.S. 929 (1961), the magistrate held that, in the circumstances of this case where documentary evidence conclusively established that Irene intended Manning to be her beneficiary, her failure to make a formal designation was not controlling. In the magistrate's view the legal invalidity of the marriage of Manning to Irene was not relevant, since the statutory scheme of preference was not called into play except insofar as it established Irene's intent that the man she held out to be her husband should receive the proceeds of her insurance.

In our view the magistrate was not warranted in supplanting the statutory preference scheme with extrinsic evidence of Irene's intent, she having failed formally to designate a beneficiary. Judgment nevertheless properly was entered for Manning because Gaines did not present sufficient evidence to rebut the Connecticut presumption in favor of the validity of the second marriage, a presumption which applies even where there is no proof of a divorce. Moreover even if the invalidity of the second marriage had been proven, it would be given sufficient legal effect under Connecticut law to qualify Manning as the widower within the meaning of § 8705 and to defeat Gaines' claim on the facts of the instant case.

### III.

■ Pursuant to § 8705(a) group life insurance proceeds are payable

"[f]irst, to the beneficiary or beneficiaries designated by the employee in a signed and witnessed writing received before death in the employing office . . . . For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect. . . . "

Clearly Irene did not designate a beneficiary "in a signed and witnessed writing received before death in the employing office". The magistrate's reliance upon other evidence that Irene intended Manning to be her beneficiary was misplaced—no matter how probative in other than the instant statutory context.

*Sears v. Austin, supra,* relied on by the magistrate, held that a valid holographic will, which clearly was intended to be a designation of a beneficiary to the proceeds of federal insurance, was effective as such. In *United States v. Pahmer,* 238 F.2d 431, 433 (2 Cir. 1956), *cert. denied,* 352 U.S. 1026 (1957), we observed that "the cases are legion which hold that in judging of the efficacy of the attempted change of beneficiary 'the courts brush aside all legal technicalities in order to effectuate the manifest intention of the insured'.", *quoting Roberts v. United States,* 157 F.2d 906, 909 (4 Cir. 1946), *cert. denied,* 330 U.S. 829 (1947). Congress however intended to overrule "this long, unbroken line of authority", *United States v. Pahmer, supra,* 238 F.2d at 433,[2] when in 1966 it amended what is now § 8705(a) to add the sentence: "For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect." Pub.L. 89–373, 80 Stat. 78 (1966).[3] The Senate Report on the amend-

---

2. Even before the amendment of § 8705 one court had departed from this "unbroken" line of authority. *Breckline v. Metropolitan Life Ins. Co.,* 406 Pa. 573, 178 A.2d 748 (1962).

3. Public Law 89–373 amended § 4 of the Federal Employees' Group Life Insurance Act of 1954, then codified as 5 U.S.C. § 2093, now codified as 5 U.S.C. § 8705. Prior to amend-

ment commented specifically on the Ninth Circuit's decision in *Sears:*

"The equities in *Sears* may have prompted the court of appeals to disregard the civil service regulation and the general intent of the statute in order to comply with the insured's wishes, but the precedent established in that case could, if generally followed, result in administrative difficulties for the Civil Service Commission and the insurance companies and, more important, seriously delay paying insurance benefits to survivors of Federal employees.

"To clarify Congress' intent, H.R. 432 [enacted as Pub.L. 89–373] rewrites section 4 to state clearly that the order of precedence set out in that section shall prevail over any extraneous document designating a beneficiary unless the designation has been properly received by the employing office . . . ." Senate Rep.No.1064, 89th Cong., 2d Sess. (1966), *quoted in* 2 U.S.Code Cong. & Admin. News, 2070, at 2071 (1966).

Congress intended to establish, for reasons of administrative convenience, an inflexible rule that a beneficiary must be named strictly in accordance with the statute, irrespective of the equities in a particular case. Federal courts uniformly have so held since the 1966 amendment. *Stribling v. United States,* 419 F.2d 1350, 1353–54 (8 Cir. 1969); *Adams v. Macy,* 314 F.Supp. 399, 400–01 (D.Md.1970); *Pekonen v. Edgington,* 298 F.Supp. 158 (E.D.Cal.1969). While the facts in these cases may show less clearly than in the case of Irene an intent on the part of the insured that a person not formally designated should receive the proceeds of the insurance, we hold that the statute precludes us from engaging in such analysis.

---

ment, § 4 established a system of precedence as follows:

"First, to the beneficiary or beneficiaries as the employee may have designated by a writing received in the employing office prior to death;

Second, if there be no such beneficiary, to the widow or widower of such employee; . . . ."

In contrast to old § 4, the present statute, see note 1 *supra,* in addition to making explicit that

## IV.

■ Since Irene made no effective formal designation of beneficiary the insurance proceeds are payable to her "widower". By this term Congress meant the insured's *lawful* widower. E. g., *Spearman v. Spearman,* 482 F.2d 1203, 1204–05 (5 Cir. 1973); *Tatum v. Tatum,* 241 F.2d 401, 405 (9 Cir. 1957) (interpreting National Service Life Insurance Act); *Lembcke v. United States,* 181 F.2d 703, 706 (2 Cir. 1950) (Swan, *J.*) (interpreting National Service Life Insurance Act; "the word 'widow' has no popular meaning which can be determined without reference to the validity of the marriage"). See also *De Sylva v. Ballentine,* 351 U.S. 570, 580 (1956) ("there is no federal law of domestic relations, which is primarily a matter of state concern").

■ In determining who is Irene's lawful widower reference appropriately is made to the law of her domicile at death, namely, Connecticut. The state of the insured's domicile is the state most interested in questions of the insured's marital status. In our view it is that state to whose law Congress intended that reference should be made in identifying the lawful spouse of the insured. *Spearman v. Spearman, supra,* 482 F.2d at 1205; *Brinson v. Brinson,* 334 F.2d 155, 158 (4 Cir. 1964); cf. *Lembcke v. United States, supra* (in determining validity of marriage, reference made to "law of the place where marriage was contracted", 181 F.2d at 706, where place of marriage also was state in which insured had resided prior to his entry into military service); see Restatement (Second) of Conflict of Laws § 283 (1971).[4]

a designation of beneficiary must be submitted to the "employing office", establishes a level of formality ("signed and witnessed writing") not required by old § 4, in the absence of which a designation of beneficiary will be ineffective.

4. Restatement (Second) of Conflict of Laws § 283 (1971) provides:

"(1) The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the

## V.

The magistrate found as a fact that Irene married Manning in 1956 without first having obtained a divorce from Gaines. He therefore concluded that the second marriage was invalid under Connecticut law. Such conclusion however failed to take into account Connecticut's strong presumption in favor of the validity of a marriage.

■ Connecticut law does characterize a bigamous marriage as "invalid". *Mazzei v. Cantales,* 142 Conn. 173, 112 A.2d 205 (1955); see *Perlstein v. Perlstein,* 152 Conn. 152, 204 A.2d 909 (1964). However, as the Connecticut Supreme Court stated in *Perlstein,*

"A marriage ceremony, especially if apparently legally performed, gives rise to a presumptively valid status of marriage which persists unless and until it is overthrown by evidence in an appropriate judicial proceeding. . . . Seldom, if ever, would a party to a bigamous marriage, in the face of the presumption of its validity, feel free to treat the marriage as a nullity without a decree of annulment. Nor do we believe any attor-

most significant relationship to the spouses and the marriage under the principles stated in § 6.

"(2) A marriage which satisfies the requirements of the state where the marriage was contracted will everywhere be recognized as valid unless it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage."

Applying these principles we also would be led to Connecticut law to determine the validity of the marriage. Among the considerations advanced in § 6 of the Restatement (Second) (to which § 283(1) makes reference) are the justified expectations of the parties which are "of considerable importance in the case of marriage. . . . " Restatement (Second) § 283, comment b. Since at the time of their marriage Irene and Manning lived in Connecticut, where they continued to live until her death, their justified expectations undoubtedly were rooted in the law of Connecticut.

The only other state to whose law we might refer to determine the expectations of the parties is Maryland. As is implicit in § 283(2), however, the state where the marriage was contracted does not necessarily have "the most significant relationship to the spouses and the

ney would advise such a course of conduct. The state's concern in the marriage status of its domiciliaries imperatively demands that the invalidity of the purported marriage be judicially determined before that invalidity can be accepted. If judicial action is needed, it must be because, in some degree at least, a status of marriage exists." (citations omitted). 152 Conn. at 157–58, 204 A.2d at 911–12.[5]

The *Perlstein* court observed that the Connecticut annulment statute then in effect, Conn.Gen.Stat. § 46–28 (1958), which provided that a court could grant alimony even where an annulment was granted on the ground that the marriage was void, was "irreconcilable with the theory that even a marriage claimed to be void is, or upon the rendition of a decree of annulment retroactively becomes, an absolute nullity ab initio so that nothing in the way of a status or res ever flowed from the marriage." *Id.* at 159, 204 A.2d at 912. The theory that an annulment relates back to render a bigamous marriage void ab initio was described as a "legal fiction" which would be "applied only as 'the purposes of justice' require."

marriage" even at the time the marriage was contracted. Resort to the law of the state where the marriage was contracted, absent other relevant contacts of the parties, ought to be made only when the law of that state would tend to validate a marriage which otherwise might not be recognized in accordance with the law of the state of the most significant relationship to the parties. Since our research discloses no difference between Maryland and Connecticut law so far as the validity of the Mannings' marriage is concerned, we have no occasion to refer to the law of Maryland to determine the justified expectations of the parties.

5. The specific holding of *Perlstein* was that even a bigamous marriage creates a sufficient status to sustain an action for annulment, see *Hames v. Hames,* 163 Conn. 588, 598–99, 316 A.2d 379, 385 (1972), and the court had jurisdiction to render such a decree as against a party to the marriage who did not reside in Connecticut and who had not been served with process in the state. The claim of the non-resident party to the bigamous marriage was that there was no jurisdiction in Connecticut since a bigamous marriage created no status whatever and therefore no *"res"* which the Connecticut courts had power to affect based on the Connecticut domicile of one of the spouses.

*Id., quoting Gaines v. Jacobsen,* 308 N.Y. 218, 225, 124 N.E.2d 290, 294 (1954).

The *Perlstein* decision was addressed specifically to the rights of a party asserting that his own marriage was bigamous.[6] The Connecticut courts nevertheless have given effect to the presumption of validity of a second marriage even when it has been attacked as bigamous by others. For example, in the leading case of *Erwin v. English,* 61 Conn. 502, 23 A. 753 (1892), the court, noting the common law presumption in favor of the validity of a marriage, held that it was incumbent on the party attacking the second marriage to prove, not only that a prior marriage was contracted and that the first spouse was alive, but also that "no divorce had ever dissolved" the prior marriage. *Id.* at 510, 23 A. at 755. Accord, *Roxbury v. Bridgewater,* 85 Conn. 196, 202, 82 A. 193, 194 (1912), cited in *Perlstein, supra,* 152 Conn. at 158, 204 A.2d at 911; cf. *Hames v. Hames,* 163 Conn. 588, 599, 316 A.2d 379, 385 (1972) ("policy of the law is strongly opposed to regarding an attempted marriage . . . entered into in good faith, believed by one or both of the parties to be legal, and followed by cohabitation, to be void"). In *Erwin v. English,* the standard of proof that no divorce decree had issued dissolving a prior marriage was described to be as stringent as the standard of proof in a criminal prosecution for bigamy. 61 Conn. at 509, 23 A. at 755.

■ Moreover the presumption in favor of the validity of a marriage increases with time, *In re Eva,* 93 Conn. 38, 47, 104 A. 238, 240–41 (1918), undoubtedly to promote reliance on the validity of the marriage relationship and to penalize the assertion of stale claims. In the instant case Gaines properly is charged with an increased burden of proof on account of the lapse of time

between Irene's second marriage and her death. Although he knew of the 1956 marriage he deferred asserting that that marriage was bigamous until after the death of the person in the best position to rebut his assertion. Irene, who apparently never discussed with Manning her prior marriage, might have known where to find the record of any divorce if she thought it was necessary to do so.[7] As it was, by harboring his claim in silence for nineteen years, Gaines laid a trap for an unwary Manning. He hardly can complain therefore of being put to a most stringent burden of proof that Manning's marriage was invalid.

■ We hold, on the record before us, that Gaines has not sustained his heavy burden. Aside from his own testimony that he never had been divorced, the only other testimony adduced by Gaines was that he had searched the records of Westchester County and Fairfield County without finding a record of a divorce. This plainly was insufficient to rebut the presumption of the validity of the second marriage since there was uncontroverted testimony that both Gaines and Irene at times maintained residences other than in the counties whose records Gaines testified he had searched. See *Spearman v. Spearman, supra,* 482 F.2d at 1206–07 (under California law presumption of validity of second marriage successfully rebutted where first spouse established that no petition for divorce or annulment had been filed in any of her or insured's known domiciles since the date of insured's first marriage).

## VI.

■ We have considered the advisability of remanding the case to the district court to allow Gaines another opportunity to re-

6. We therefore do not read *Perlstein* as requiring that a party to a *prior* marriage, but not to the bigamous second marriage, obtain a decree that the subsequent marriage is void as a condition precedent to attacking that marriage's validity in another proceeding where the validity of the second marriage is put in issue. But see Conn.Gen.Stat. § 46–64 (1967).

7. Alternatively, had Gaines voiced his contention that Irene was his lawful spouse prior to her death, and had Irene actually not been divorced, she could have remedied the defect in her second marriage by divorcing Gaines and re-marrying Manning. With respect to the insurance policy, she could have expressly designated Manning as her beneficiary. The magistrate found beyond "a shadow of a doubt" that she would have done so.

but the presumption of validity of the second marriage. We have concluded however that this would be an exercise in futility for the reason that under Connecticut law Manning's marriage would have sufficient legal effect to entitle him to the proceeds of his wife's insurance even if Gaines were able to prove satisfactorily that the marriage was bigamous.

The *Perlstein* case, discussed above in connection with the Connecticut presumption of validity of a second marriage, appears to assume that a bigamous marriage is "invalid". In addition, as noted above,[8] we do not read *Perlstein* as precluding an attack on a bigamous marriage by a nonparty to that marriage even in the absence of a judicial decree declaring the marriage void. *Perlstein* however forcefully rejects the theory that a bigamous marriage is "an absolute nullity ab initio so that nothing in the way of a status or res ever flowed from the marriage", 152 Conn. at 158, 204 A.2d at 912, and the invalidity ab initio following annulment of a bigamous marriage was characterized as a "legal fiction" to be "applied only as 'the purposes of justice' require." *Id.* While the Connecticut courts do not appear to have had subsequent occa-

sion to elaborate upon this language,[9] we believe it means at a minimum, under the circumstances of this case, that Manning would have sufficient legal status as a "widower" to entitle him to the insurance proceeds. For after all the insurance was paid for by deductions from Irene's wages earned after the second marriage, during which period Irene and Manning consistently held themselves out as husband and wife, and during which period Gaines had nothing whatever to do with Irene.[10] Gaines did nothing in reliance on his own status except to maintain in silence his claim that he was Irene's lawful spouse. The "purposes of justice" therefore under Connecticut law would not require the complete and retroactive invalidation of the Mannings' relationship. We hold, at the very least, for the purpose of determining Manning's right to the proceeds of Irene's federal employees' group life insurance, that Manning was the lawful widower.[11]

Affirmed. No costs.

---

**8.** See note 6 *supra.*

**9.** In *Perlstein* itself however the court noted that the annulment statute in effect at the time of that decision provided for grants of alimony even where an annulment was granted on the ground that the marriage was void. 152 Conn. at 159, 204 A.2d at 912. The present annulment statute, Conn.Gen.Stat. § 46–32(b) (Supp. 1977) provides that "[a]n annulment shall be granted whenever, from any cause, the marriage is void or voidable", and Conn.Gen.Stat. § 46–52 (Supp.1977) provides that "[a]n annulment shall be granted whenever, from any cause, the marriage is voidable", and Conn. Gen.Stat. § 46–52 (Supp.1977) provides that alimony can be granted where a marriage is annulled. Moreover under Conn.Gen.Stat. § 46–51 (Supp.1977) when a marriage is dissolved by annulment the court may assign to either spouse any part of the property of the other. Obviously a bigamous marriage can give rise to substantial rights under Connecticut law.

See also *MacPherson v. MacPherson*, 496 F.2d 258, 263–65 (6 Cir. 1974) (Connecticut law, in light of *Perlstein*, gave bigamous remarriage

sufficient status to destroy alimony rights from first marriage).

**10.** See Conn.Gen.Stat. § 46–12 (Supp.1977) (a party *to* a marriage shall not be entitled to a statutory share of his deceased spouse's estate when the party "without sufficient cause, abandoned the other and continued such abandonment to the time of the other's death").

**11.** We do not believe that Congress in enacting § 8705 referred to the lawful widow or widower as those terms might be used in an abstract sense. Rather, we think that Congress posited an inquiry *as to who*, as a practical matter, would be entitled under applicable state law to the rights normally attaching to a surviving spouse. If an issue were to arise in the Connecticut courts, for example, as to which purported widower here would have rights of intestate succession in Irene's property, we believe that Manning would prevail, even assuming arguendo that the Connecticut courts might characterize his marriage to Irene as "invalid". *See notes 9 and 10, supra,* and accompanying text. We conclude therefore that Manning is the lawful widower of Irene within the meaning of the federal statute.