## FRANCES TROTTA
vs.
## FRANCIS TROTTA

Superior Court    New Haven County    File #51519·

Present: Hon. ALFRED C. BALDWIN, Judge.

Joseph Koletsky,    Attorney for the Plaintiff.

## MEMORANDUM FILED JULY 14, 1937.

BALDWIN, J.  The complaint alleges in paragraph 1 that the parties intermarried November 14, 1936.  In paragraph 2, residence of three years of each of the parties is alleged.

In paragraph 3 it is alleged that the parties never were in fact married, despite the ceremony which was performed, because of the lack of real consent on the part of either to enter into that relationship and immediately following the pretended marriage which never did come into legal existence, the plaintiff and defendant returned to their respective homes and have never cohabited nor assumed any of the reciprocal responsibilities and duties of the marital relation, and she seeks a decree declaring the alleged purported marriage to be a void marriage.

Annulment may be decreed by the court when the marriage was a void or a voidable marriage.  Annulment may not be decreed when the marriage was a legal marriage.  The dissolution by a court of a legal marriage must be by decree of divorce granted upon an existing cause for such decree.  Since the Court is applied to for a decree annulling this marriage the question presented is whether this marriage was either a void, voidable or a valid marriage.

The marriage was solemnized at Pawling, New York, November 14, 1936.

At about 1:15 in the afternoon of that day the plaintiff, who was twenty-five years of age, and who had been an employee in a bank for upwards of six years, was on Chapel Street in New Haven on her way to the railroad station to take a train leaving at 2:20 P. M. for New York, there to meet her fiance, a Columbia medical student to whom she had been engaged to be married for a period of three years and with whom she was to attend a school dance that evening when she met the defendant, who was an acquaintance of several years.  Upon inquiry by the defendant as to where she was going she told him and he asked her if he could drive her to the station.  His offer was accepted and on the way to the station he asked her to go to West Haven with him to inform other people whom he was to drive that afternoon into the State of New York that he was driving plaintiff to the station.

The much more direct way from where the parties met on Chapel Street would have been to the station and thence to West Haven rather than to West Haven and thence to the station. They proceeded to West Haven to a home where there were two couples whom the defendant was to drive into the State of New York. One of these couples were young people and were going into that State to be married and thence they were to proceed to New York City.

Plaintiff testified that she was invited to ride with them to New York. She accepted and they proceeded to Pawling, New York via Danbury. While passing through Danbury defendant asked the plaintiff, "How about we two being married?" to which plaintiff responded, "Don't be silly. I am on my way to New York for a good time at a dance." Defendant responded, "Why, you wouldn't have the moxie" (meaning the nerve) to do it anyway." "We talked about it back and forth. There was nothing definite agreed to." Defendant also said, "I would not have the nerve and it wasn't in me to do anything like that," and to this plaintiff responded, "Jim, what do you mean, I wouldn't have the nerve?"

They proceeded to the Registrar's office in Pawling, N. Y. where plaintiff and defendant and the other couple procured marriage licenses. Plaintiff then proceeded to a Western Union telegraph office in Pawling and sent a telegram addressed to her affianced (whom she had intended to meet at the railroad station in New York) of which the following is a copy: "Will be very late will call as soon as I arrive". This was approximately 5 o'clock P. M.

They then proceeded to the home of a clergyman; arriving there plaintiff testified that she "wouldn't get out of the car and I said no, I couldn't possibly go through with it". The defendant said, "Well, come in anyway and witness their ceremony". They entered and the two couples were married. The party then proceeded to New York City. When they reached Bronx, N. Y., plaintiff went to a telephone and called the man to whom she had been affianced and told him she had married the defendant. This he hesitated to believe and requested that she and defendant come to his place, to which they proceeded.

Arriving there plaintiff and defendant and her affianced talked the situation over and they decided to leave it to plaintiff to decide as to what she should do and she testified, "I

decided to come back to New Haven and not go to the dance".

These three returned to New Haven by train late that night. They went to a restaurant where they talked the situation over and very early the following morning plaintiff and her affianced returned to New York, where she spent the day returning to her home in New Haven the evening of that day, Sunday.

It appeared in evidence that plaintiff and her affianced had been having some quarrels "for about the space of a month".

The following questions addressed to the plaintiff by the Court were answered as follows:

"Q. If you did not intend to marry him (the defendant) what did you go through the ceremony for? A. I did it on a dare and because I thought this was one way of spiting . . . (her fiance) for having caused me the trouble he had . . .

Q. Now if you wanted to spite him while on your way to go to a dance with him why did you divert your course and go and get married to another man? A. Well, because the opportunity just came up out of the air so to speak.

Q. The dare to get married came along? A. No, not to get married, your Honor.

Q. What was the opportunity? Opportunity for what? A. To hurt some one as much as I had been hurt."

This is a brief resume of the testimony of the plaintiff. There was no corroborative testimony offered although there were five others in the party throughout the events leading up to and including the ceremony.

The parties have not lived together nor have they in any way held themselves out as husband and wife. They returned to their respective homes and the plaintiff kept these events secret from her family and associates until this trial was actually in progress.

Plaintiff has regretted very considerably the entanglement she got into and it has caused her much worry; she promptly consulted counsel and this action was promptly brought.

Plaintiff relies on **Davis vs. Davis, 119 Conn. 194** and authorities therein cited. In the Davis case the parties were each nineteen years old. In the instant case they were each twenty-five years old and the plaintiff had had upwards of six

years experience in employment in a bank and had been engaged to be married about three years to another man. In the Davis case the Court found that neither party intended at the time to enter into the marriage status. In the instant case it does not appear that at the time the defendant did not intend to enter into the marriage status, nor is it clear to the Court from the testimony of the plaintiff—the reasons she has given for entering into the marriage, and the circumstances leading up to and surrounding the ceremony that she, at the time did not intend to enter into the marriage status with the defendant.

The subsequent regret and worry and humiliation which plaintiff has endured, while unfortunate, does not determine the question of the legality or the voidability of this marriage. Cohabitation or the absence of the consummation of the marriage does not determine its legality. These conditions are incidents and their bearing upon the legality of a marriage are more remote since they follow the marriage. The Court is concerned with those incidents leading up to the celebration of the marriage ceremony and the incidents immediately surrounding that ceremony in order to determine the state of mind and the intention of the parties when entering into the ceremony of marriage, and hence, the validity of the marriage.

"Where parties have entered into a valid marriage, it may be dissolved only where one of the grounds of divorce specified in the statutes is present and only in accordance with the procedure established by the statutes."

**Davis vs. Davis, Supra, at page 196.**

**Dennis vs. Dennis, 68 Conn. 186, 197.**

Courts are without power or authority to render a decree of annulment when the marriage was a valid marriage. It is only when the marriage is void or voidable that a decree of annulment may be entered. Ordinarily the void or voidable marriage is the result of mistake or fraud or force or coercion in procuring the marriage. The instant case presents no question involving mistake, fraud, force or coercion. It is claimed there was no intention on the part of the plaintiff to marry and no real consent by her to the marriage and that the situation is like that in the Davis case, supra. In that case, our Court, at page 202, said:

"Cases like this are naturally rare, because not often will people, even young in years, so trifle with such a

vital relationship as that of marriage. But so fundamental is the principle that there can be no marriage without the consent of the parties and so accepted is the rule that, though parties go through the form of a contract, if both understand that neither intends to assume a contractual obligation, no real contract is created, that we deem it a part of the general common law that in such a situation as this no marriage ever came into existence."

Here it is to be noted that the Court says:

". . . if both understand that neither intends to assume a contractual obligation, no real contract is created."

And again at page 203 the Court says:

"But where it clearly appears that two young people, by their foolish and unconsidered conduct, have gotten themselves into such a situation as arises out of the per-formance of a marriage ceremony between them without the intent on the part of either to enter into the marriage relationship and cohabitation has not followed, we have no doubt that it is in the public interest to declare them to be unmarried," etc.

Here the Court is speaking of the absence of intent on the part of both of the parties which clearly appears.

The courts have frequently stated that to decree annulment the evidence must be clear and convincing. In this case the evidence is not clear or convincing that these people did not fully understand and intend the natural consequences of their acts. The evidence of the regrets and the worry plaintiff has endured since the marriage appeals to the Court, but these are not the conditions upon which a court may justify its decree. It must find that the conditions leading up to and surrounding the marriage have been established by clear and convincing evidence to be such as to render the marriage void or voidable.

The case does not come within the Davis case and I can find no authority that leads me to the conclusion that the Court can find that this marriage was not a valid marriage.

Judgment may therefore enter denying plaintiff a decree of annulment and dismissing the complaint.