[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON COMPLAINT FOR ANNULMENT
This action, seeking an annulment, was returnable to the Superior Court on December 9, 1997. The plaintiff filed a complaint in two counts. The first count sought a decree annulling the marriage and the second count sought a dissolution of the marriage. The defendant then filed a one count cross CT Page 9022 complaint also seeking a decree annulling the marriage. The parties both requested an annulment on the first count of the plaintiff's complaint.
 FACTS
After hearing the evidence, the court finds that paragraphs 1, 3, 4, and 5 of the first count of the plaintiff's complaint seeking an annulment has been proven. The following facts are found: The plaintiff, Dennis Ross, and the defendant, Judith Ross, whose maiden name was Judith Copeland Lawson, were intermarried in New Canaan, Connecticut on October 4, 1997. The plaintiff, Dennis Ross, has been residing continuously in the state of Connecticut for at least twelve months next preceding the date of the filing of his complaint. There are no minor children issue of the marriage. No other children have been born to the defendant since the date of this marriage. Neither party has received benefits from the state of Connecticut. Both parties' prior marriage had terminated in civil divorce. Their former spouses were living. The parties separated on October 23, 1997, less than three weeks after entering into the marriage ceremony.
Both paragraph 2 of the plaintiff's complaint and paragraph 2 of the defendant's cross complaint are identical: "The marriage should be annulled because the marriage was performed by a person who was not empowered to perform marriages in Connecticut pursuant to Connecticut General Statutes Section 46b-22." Both parties' Claims for Relief request "a decree of annulment of the marriage in accordance with Connecticut General Statutes 46b-40."
The evidence further shows that the parties were married in a ceremony that took place at the plaintiff s home in New Canaan, Connecticut. The home was totally within the boundaries of the state of Connecticut. The marriage ceremony was performed by Father _____ Fr._____ was known to the parties and performed the ceremony in his capacity as a priest of the Episcopal church. Fr._____ is rector of _____ church in _____ New York and was on October 4, 1997, the day he performed the ceremony. ______ church in _____ New York is an Episcopal church. Both parties claim that there was a deficiency in obtaining the necessary ecclesiastical permission for Father _____ to perform this marriage ceremony in Connecticut.
The parties claim that there is a two-step process for an Episcopal priest to perform a marriage ceremony out of state. The CT Page 9023 first step is the filling out of a form and sending it to resident Bishop, in this case the Bishop of the state of Connecticut. The evidence shows that this step was not performed. The second step requires that the consent be "affirmed by the Bishop of that jurisdiction." The evidence indicates that no such affirmation was obtained. In support of second assertion the plaintiff offered Exhibit 2, a letter dated November 12, 1997, addressed to Mr. Dennis Ross from Sandra F. Cannone, Administrative Secretary to the Bishop Suffragan at 1335 Asylum Avenue, Hartford, Connecticut 06105-2295. The letter is on the stationery of "The Episcopal Diocese of Connecticut". The letter states as follows: In regard to your inquiry about your marriage in New Canaan. We did not receive correspondence from Fr. _____, asking for permission to marry you and Ms. Lawson in Connecticut. Thank you for calling."
In further support of the parties' claims, Canon 18 and Canon 19 of "The Canons of the General Convention of the Episcopal Church (199 1)" were offered into evidence as Exhibit 1. Canon 18 is entitled "Of the Solemnization of Holy Matrimony."Section 1, Canon 18 states, "Every Member of the Clergy of this Church shall conform to the laws of the State governing the creation of the civil status of marriage, and also to the laws of this Church governing the solemnization of Holy Matrimony." Canon 19 is entitled "Of Regulations Respecting Holy Matrimony: Concerning Preservation of Marriage, Dissolution of Marriage, and Remarriage." Sec. 3(d) of Canon 19 states "If the proposed marriage is to be solemnized in a jurisdiction other than the one in which the consent has been given, the consent shall be affirmed by the Bishop of that jurisdiction." According to Sec. 3 (c) of Canon 19, since Fr. _____ was canonically residing in New York, he had to obtain the consent of the Bishop of New York to perform a marriage ceremony of persons who had been husband and wife of any other person then living. Since the Ross marriage was to be solemnized in Connecticut where Fr. _____ was not canonically residing, the provisions of Sec. 3(d) were applicable. In further support of the alleged noncompliance with Sec. 3(d), hearsay evidence was offered in the form of testimony by the defendant that she had spoken to Fr. _____ after the annulment action was filed. Fr. _____ stated to the defendant, that he never asked for consent of the Bishop of the State of Connecticut in accordance with Sec. 3(d), Canon 19.
The parties submitted a separation agreement dated February 13, 1998. Incorporation of agreements into a decree is covered by CT Page 9024 General Statutes § 46b-66.
 In any case under this chapter where the parties have submitted to the court an agreement concerning the custody, care, education, visitation, maintenance or support of any of their children or concerning alimony or the disposition of property, the court shall inquire into the financial resources and actual needs of the spouses and their respective fitness to have physical custody of or rights of visitation with any minor child, in order to determine whether the agreement of the spouses is fair and equitable under all the circumstances. If the court finds the agreement fair and equitable, it shall become part of the court file, and if the agreement is in writing, it shall be incorporated by reference into the order or decree of the court.
It is under the authority of § 46b-66 that the parties ask that their February 13, 1998 agreement be approved by the court, become part of the court file and be incorporated by reference into the decree of annulment. § 46b-66 begins with the phrase "In any case under this chapter." This refers to Chapter 815j, which is entitled "Dissolution of Marriage, Legal Separation and Annulment." Thus, this court has the statutory authority to incorporate by reference property, support and custody agreements in a decree of annulment
Although the parties are asking for an annulment, Connecticut permits dissolution type orders to be entered in annulment decrees. General Statutes § 46b-40(a)(2) ( Both a dissolution and annulment are referred to as "decrees."); § 46b-45(a). (The method of serving and filing a complaint in an annulment is identical to a dissolution);. § 46b-56(a). (Child custody orders can be entered in an annulment action); § 46b-66. (Agreements can be incorporated by reference); § 46b-81(a). (Real property can be ordered to be sold in an annulment action); . § 46b-82. (Alimony can be awarded in an annulment action); § 46b-84(a). (Child support can be ordered for a child, issue of an annulled marriage).
This court has reviewed the February 13, 1998 agreement. It has reviewed the parties' financial affidavits and has listened to the testimony. This court finds that the February 13, 1998 agreement is fair and equitable under all the circumstances. This court would be inclined to incorporate this agreement into the decree of annulment should such a decree enter.
The parties proceeded on the first count of the plaintiffs CT Page 9025 complaint seeking an annulment. The plaintiff's second count alleged that "the marriage of the parties has broken down irretrievably" and sought a decree dissolving the marriage. The defendant's answer admitted each of the allegations of the second count. The defendant did not file a cross complaint seeking a decree dissolving the marriage. Neither party requested relief from this court at this time on the plaintiffs second count seeking a decree dissolving the marriage.
 DISCUSSION OF LAW
An annulment can be granted on common law grounds or statutory grounds. In general, common law grounds have been incorporated in our statutes. "An annulment shall be granted if the marriage is void or voidable under the laws of this state or of the state in which the marriage was performed." General Statutes § 46-40(b). The parties have not alleged any common law claim for annulment.
There are statutory grounds for annulment. General Statutes § 46b-21 (Marriage of certain kindred); § 46b-22 (Marriage attempted to be celebrated by persons other than those listed); § 46b-24 (Marriage performed in Connecticut without a marriage license); § 46b-29 (Marriage of persons under conservationship or guardianship); § 46-30 (Marriages of minors); § 45b-48 (Conviction of an offense against chastity).
 All judges and retired judges, either elected or appointed, family support magistrates, state referees and justices of the peace may join persons in marriage in any town in the state and all ordained or licensed clergymen, belonging to this state or any other state so long as they continue in the work of the ministry may join persons in marriage. All marriages solemnized according to the forms and usages of any religious denomination in this state, including marriages witnessed by a duly constituted Spiritual Assembly of the Baha'is, are valid. All marriages attempted to be celebrated by any other person are void.
General Statutes § 46b-22(a).
A codicil to that statute is General Statutes § 46b-22(c), "Any person violating any provision of this section shall be fined not more than fifty dollars." Furthermore, attention is drawn to General Statutes § 46b-23: "Any person who undertakes to join persons in marriage, knowing that he is not authorized to do so, shall be fined not more than five hundred dollars or CT Page 9026 imprisoned not more than one year or both." Though there appears to be no real threat of criminal prosecution under either of those two statutes, this court's decision could affect the clergyman involved. See New York Times, March 14, 1998 page A7 for an article in which a church tribunal voted on whether or not the performance of a certain marriage ceremony violated church law of the largest Protestant denomination in the United States.
There are two types of regulations concerning the validity of a marriage: 1) Substantive requirements determining those eligible to be married and 2) The "formalities prescribed by the state for the effectuation of a legally valid marriage."Carabetta v. Carabetta, 182 Conn. 344, 347 (1980). The formality requirements are of two sorts: 1) a marriage license and 2) solemnization. This case involves the issue of lack of solemnization.
Marital status arises not from the simple declarations of persons nor from the undisputed claims of litigants. Perlstein v.Perlstein, 152 Conn. 152, 156 (1964). Connecticut does not recognize common-law marriages. State ex rel. Felson v. Allen,129 Conn. 427, 432 (1943); Hames v. Hames, 163 Conn. 588, 593
(1972). "A marriage ceremony, especially if apparently legally performed, gives rise to a presumptively valid status of marriage which persists unless and until is overthrown by evidence in an appropriate judicial proceeding." Perlstein v. Perlstein, supra,152 Conn. 157. "Our statute has been construed to require the marriage contract to be entered into before authorized persons and with certain formalities which the state has prescribed."Hames v. Hames, supra, 163 Conn. 593; Dennis v. Dennis,68 Conn. 186, 196 (1896). "While the statute (46b-22) in terms makes void only a marriage celebrated by an unauthorized person, the provision carries the necessary implication that no valid marriage is created when there is no celebration at all but merely an exchange of promises, or cohabitation under such circumstances as would constitute a common-law marriage." Stateex rel. Felson v. Allen, supra, 129 Conn. 432.
In Hames, the plaintiff wife and the defendant husband obtained a civil divorce in 1957 from each other. They had been validly married in 1955 according to the rites of the Roman Catholic Church. They appeared before a Catholic priest in 1960 and expressed their intentions to remarry each other. They then applied for a marriage license which was issued by the proper public official. A few days later defendant alone took the CT Page 9027 marriage license to the Roman Catholic priest. The priest signed the license and the parties resumed marital life. The plaintiff did not appear before the priest. The marriage license signed by the priest was filed with the proper public authorities. Ten years later the plaintiff sought an annulment, divorce, and other equitable relief.
The trial court found that the 1960 marriage ceremony was held in accordance with the forms and usages of the Roman Catholic religion and, therefore, a valid marriage under General Statutes § 46b-3 (now § 46b-22) was performed. The trial court found according to Roman Catholic canon law, "the divorce of 1957 legally separated the parties; and that the intention of the parties in 1960 to remarry and the subsequent signing of the marriage certificate by the Roman Catholic priest, whose religion does not recognize the legal divorce of 1957, meets the requirement of General Statutes 46b-3 in that the marriage in 1960 was solemnized in accordance with the forms and usages of the Roman Catholic religion." Hames v. Hames, supra,163 Conn. 591-92. "The Catholic Church does not call this remarriage. The church says the bond exists and the priest simply signs this license to cover the civil law to testify to the fact that this couple intends now to hve together as man and wife." Id., 591.
The Supreme Court reversed and held that the plaintiffs absence in 1960 from the ceremony in which the priest signed the marriage certificate prevented solemnization for the purpose of General Statutes § 46-3 (currently General Statutes § 46b-22). The noncompliance with that statute precluded the parties from acquiring valid marital status and rendered the 1960 marriage voidable. The Supreme Court, in reversing, noted that despite the compliance with Roman Catholic canonical law, "there is no question that the divorce decree granted to the in 1957 dissolved their previous marital status. Religious doctrines notwithstanding, the parties were legally divorced, not merely legally separated, by force of a decree binding on all the world as to the existence of their status." Id., 594; Vogel v. Sylvester,148 Conn. 666, 670 (1961).
Although the second marriage was allegedly solemnized under the General Statute 46b-3 (now § 46b-22), "Some form of marriage promise, some ceremony, however slight, has always been deemed essential to the validity of marriage . . . For the very definition of marriage implies that there should be not only the consenting mind, but an expression of the consenting mind, by words or signs, which expression in proper form constitutes the CT Page 9028 marriage agreement." Id, 595-96. "Our statutory scheme specifies no precise form for the celebration of marriage; nor does it explicitly reqiure that the parties declare that they take one another as husband and wife." Id., 596. "The law has not pointed out any mode in which marriages shall be celebrated, but has left it to the common custom and practice of the country. Any form of words which explicitly constitutes a contract and engagement from the parties to each other, and published in the presence of, and by the officer appointed by the Statute, will be a valid marriage." Id., 596; 1 Swift, Digest, p. 20. "The contract must be solemnized according to the ceremonies prescribed by law."State ex rel. Felton v. Allen, supra, 129 Conn. 432. Hames
adopted a minimalist definition of "solemnize". "To solemnize means nothing more than to be present at a marriage contract in order that it may have due publication before a third person or persons for the sake of notoriety and the certainty of its being made." Hames v. Hames, supra, 163 Conn. 596.
Therefore this court concludes that it is civil law, not canon law, that determines the solemnization of the marriage ceremony under General Statutes § 46b-22.
The Federal Constitution requires the independence of government from religion. The first amendment to the United States constitution provides; "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The constitution does not permit courts to advance or foster religion. The first amendment to the United States constitution and Article seven, § 1 of the constitution of Connecticut serve similar purposes. "Its purpose was to erect a wall of separation between Church and State, and thus had a purpose similar to that of the Establishment Clause of the first amendment of the United States constitution." GriswoldInn, Inc. v. State, 183 Conn. 552, 558-59 (1981). "Thefirst amendment prohibits the excessive entanglement of government and religion. In order for a statute to conform to this mandate, it must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion and; third, the statute must not foster an excessive government entanglement with religion." Lemon v. Kurtzman,403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Board ofEducation v. State Board of Education, 243 Conn. 772, 783-84
(1998).
At what point is the line drawn that a state court has CT Page 9029 excessively entangled with canon law? There is no bright line and courts are currently struggling with the issue. Thefirst amendment does not bar application of a secular standard to certain tortious conduct in a church setting. In Mullen v.Horton, 46 Conn. App. 759 (1997), the respondeat superior claim against the institutional defendant for a tort committed by a defendant priest can be resolved under Connecticut law without resorting to ecclesiastical standards of church doctrine. "A trier of fact could reasonably determine that Horton's sexual relationship with the plaintiff was a misguided attempt at pastoralu counseling, or even an unauthorized, unethical, tortious method of pastoral — psychological but not an abandonment of church business." Id., 765-66. See alsoMartinelli v. Bridgeport Roman Catholic Diocesan Corp., U.S. District Court (Docket No. 3:93 CV 1482) (March 31, 1998) (Arterton, J), Connecticut Opinions, p. 462, April 20, 1998, which held that the tort claim was not "clergy malpractice" and, therefore, can be resolved under Connecticut law without resort to ecclesiastical standards or Church doctrine. Martinelli also held that a claim of breach of fiduciary duty can be resolved under Connecticut law.
It has been held to be entanglement if a court intrudes upon the free exercise of religion and prohibits conduct within that religion for religious purposes. But the first amendment does not relieve an individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. Nutt v.Norwich Roman Catholic Diocese, 921 F. Sup. 66 (D. Conn. 1995),Church of Lukumi Babalu Aye Inc. v. City of Hialeah,508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); MinersvilleSchool District Board of Education v. Gobitis, 310 U.S. 586,594-95, 60 S.Ct. 1010, 1013, 84 L.Ed. 1375 (1940). "This court agrees with the decisions in Nutt and Reynolds
(Reyvnolds v. Zizka, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV95 0555222S, March 5, 1998) (Aurigemma, J.) that the court's determination of an action against the movants based on their negligent supervision of a priest would not prejudice or impose upon any of the religious tenets or practices of Catholicism." Doe v. Hartford Roman CatholicDiocesan Corp., 45 Conn. Sup. 388, 396 (1998).
Certain religious corporations have references in the Connecticut General Statute and are found under the general corporate law in Title 33. These statutes do not interfere with the internal workings of the religion. General Statutes §§ CT Page 903033-265 through 33-267, relate to the Protestant Episcopal Church which, in the current case, is the church in question; §33-265 permits the societies to exist as parishes, to have the power to receive and hold gifts, to own real property and to exercise all the ordinary powers of corporations: § 33-266 permits the adoption of regulations for the internal workings of the Protestant Episcopal Church as "are provided and prescribed by the constitution, canons and regulations of said Protestant Episcopal Church in this state" and § 33-267, states that "When one society includes two or more organizations recognized as ecclesiastically distinct, but in law constituting one corporate body, officers may be appointed for the management of the separate affairs of each of the organizations and the general affairs of the society shall be under the united management of the officers so appointed." There are no other Connecticut statutes regarding the Protestant Episcopal Church.
Other religious denominations have statutory authority in Connecticut under Chapter 598 entitled "Religious Corporations and Societies": Methodist Church (General Statutes §§ 33-278); through 33-276); Augustana Evangelical Lutheran Church (General Statutes §§ 33-277 and 33-278); Lutheran Church in America (General Statutes §§ 33-278a and 278b); Roman Catholic Church (General Statutes §§ 33-279 through 33-281); and The United Methodist Church (General Statutes § 33-281a). These statutes do not control the internal working of those religious denominations and are not in violation of the first amendment nor Article seven, § 1.
The limits of a court's involvement in internal church disputes was set in Watson v. Jones, 80 U.S. 679, 20 L.Ed. 666
(1872). Watson involved a church schism caused by a disagreement over slavery. This schism caused a law suit over the ownership of church property. "A court has the obligation to enforce the decision of the highest church tribunal that has ruled on the question of discipline, or of faith or eccelesiastical rule, custom or law." Id., 723. Connecticut followed Watson v. Jones in 1900. Trustees of Trinity M.E. Church v. Harris, 73 Conn. 216
(1900) involved the validity of a mortgage to Trustees of a named Church and "their successors in office". "We think these authorities are sufficient to establish the proposition above stated, that in all matter ecclesiastical the decision of Bishop Walden to the effect that the plaintiffs are, according to the rules, usages, law and discipline of the Methodist Church, the successors of the grantees named in the deed of Mr. Swan, ought CT Page 9031 to have been held by the Superior as binding upon it and that the general claims of the plaintiff are correct, and that their prayers for relief, as the pleadings now stand, should have been granted." Id., 266. This rule continued in Connecticut withIndependent Methodist Episcopal Church v. Davis, 137 Conn. 1, 13
(1950).
In 1979 the United States Supreme Court decided Jones v.Wolf, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) which held that civil courts have the general authority to resolve questions of church property ownership. Connecticut adopted Jones v. Wolf in 1980 in a real property dispute. "It is now well established that state judicial intervention is justified when it be be accomplished by resort to neutral principles of law arising out of the law of property and of trusts that eschew consideration of doctrinal matters such as the ritual and liturgy of worship or the tenets of faith." New YorkAnnual Conference v. Fisher, 182 Conn. 272, 281 (1980).
Fisher was followed by Trinity-St. Michael's Parish v.Episcopal Church, 224 Conn. 797 (1993). Trinity-St. Michael's
holds that in resolving disputes between a local parish and the higher hierarchical church organization with respect to the ownership of church property, a civil court first determine whether an express trust in favor of the general church exists. If no express trust is found, the court must determine, by examining the church constitution, canons, and polity or system of church government agreed to by the members, whether an implied trust in favor of the general church exists. Id., 804.
The general holding of Watson v Jones, still governs courts' interference with religious practices in non-property disputes. "The first amendment to the United States constitution however, severely circumscribes the role that civil courts may play in resolving church property disputes . . . It therefore forbids civil courts from resolving church property disputes by inquiring into and resolving disputed issues of religious doctrine and practice." Id., 801. The principle of deference to eccleslatical doctrines and practices arises out of the first amendment and the public policy of "the value, in a plurastic democratic society, of affording latitude to autonomous associations to conduct their own affairs without unnecessarily intrusive judicial supervision." New York Annual Conference v. Fisher, supra,182 Conn. 281. "Were this court to accord legal effect to his acts, it would be in the curious — and unconstitutional — position of CT Page 9032 supplanting state power with ecclesiastic power. Obviously, even if canon law should deny the authority of the state to dissolve a marriage, religious doctrine could not nullify the decrees of our courts." Hames v, Hames, supra, 163 Conn. 594-95.
Although in 1973 the Connecticut legislature made it virtually impossible for a court to reject a complaint for a dissolution of marriage, no such statute was passed concerning annulments. In most reported contested annulment cases tried to ' Connecticut courts since 1973, the request for annulment has been denied. Most complaints allege a second count, a fall-back position, seeking a dissolution of marriage. In most of those cases the decree dissolving the marriage was entered. Faittibenev. Faittibene, 183 Conn. 433, 440 (1981); Phillips v. Dame, Superior Court, judicial district of New London at New London, Docket No. 518815 (July 11, 1991) (Mihalakos, J.),4 CONN. L. RPTR. 650,6 CSCR 718, 1991 Ct. Sup. 6638; Gregor v. Kamerling, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 0257042 (August 5, 1992) (Bassick, J.), 1992 Ct. Sup. 7411; Sinojia v.Sinojia, Superior Court, judicial district of Waterbury at Waterbury, Docket No. 113953 (September 27, 1994) (Harrigan, J.), 12 CONN. L. RPTR. 483, 1994 Ct. Sup. 8811-D; Roby v. Roby, Superior Court, judicial district of New Haven at Meriden, Docket No. 0245099 (May 19, 1994) (Stanley, J.), 11 CONN. L. RPTR. 509,1994 Ct. Sup. 5376; Hardy v. Hardy, Superior Court, judicial district Hartford/New Britain at Hartford, Docket No. 57392 (November 7, 1995) (Klaczak J.), 1995 Ct. Sup. 12572-Z; Johnson v. Johnson, Superior Court, judicial district of New Haven at New Haven, Docket No. 02574446 S (July 24, 1997) (DiPentima, J.), 1997 Ct. Sup. 7207.
It is the plaintiff's burden of proof to prove the grounds for annulment. Fattibene v. Fattibene, supra, 183 Conn. 438). "A petition for the annulment of a marriage on this ground requires of the court hearing it great caution and demands clear proof "Davis v. Davis, 119 Conn. 194, 203 (1934). "It must find that the conditions leading up to and surrounding the marriage have been established by clear and convincing evidence to be such as to render the marriage void or voidable." Trotta v. Trotta,5 Conn. Sup. 218, 223 (1937). "An annulment is not favored." Durham v.Miceli, 15 Conn. App. 96, 97 (1988).
Marriages are strongly favored by the law. Existing marriages are presumed to be valid and that presumption has been described by the courts as very strong. Carabetta v. Carabetta, supra,183 Conn. 351; Manndorff v. Dax, 13 Conn. App. 282, 286 (1988). CT Page 9033Carabetta found the public policy favoring marriages so strong that it upheld an unlicensed ceremony. Id., 351. "Thus, inCarabetta, we decided not to invalidate legally inperfect marriages, if the parties had: (1) participated in a religious rite with the good faith intention of entering into a valid legal marriage; and (2) shared and manifested a good faith belief that they were, in fact, legally married." State v. Nosik,245 Conn. 196, 202 (1998).
A plain reading of General Statutes § 46b-22 as to clergymen states: "and all ordained or licensed clergymen, belonging to this state or any other state, so long as they continue in the work of the ministry may join persons in marriage." The facts show that this marriage took place in Connecticut. Fr. _____ was at all times an ordained clergyman. Where he is "licensed" is irrelevant. He is a clergyman with a parish in the state of New York. § 46b-22 delineates "or any other state." This phrase permits New York licensed clergymen to perform marriages in Connecticut. The only other statutory condition for clergymen is that they must be actively engaged in the work of their ministry. There is no evidence to indicate that Fr. _____ was other than the rector of the _____ Church in _____ , New York, and on October 4, 1997 was fully engaged in his ministry as a priest of the Episcopal Church. There is no statutory requirement that the clergyman performing the marriage ceremony must be working in the ministry in Connecticut. The legislature could have imposed such a statutory requirement, but they did not. Fr. is therefore an authorized person to perform marriages in Connecticut according to the plain reading of § 46b-22.
The only statutory claim that the parties have that this marriage was void is contained in the next to last sentence § 46b-22: "All marriages solemnized according to the forms and usages of any religious domination in this state". The first sentence of § 46b-22, discussed in the the previous paragraph, determines who is authorized to perform a marriage ceremony. The second sentence relates to the ceremony itself, its words, and procedures. This court has found that Fr. _____ was at all times an ordained clergymen, belonging to the state of New York, who on October 4, 1997, was continuing in the work of the ministry. Therefore, by Connecticut law he is authorized to perform a Connecticut marriage. There is no evidence that the ceremony he performed was according to the traditions of the Episcopal Church. The second sentence does not trump nor define the "who" requirement of the first sentence.
The parties claims violate public policy. "A marriage ceremony is presumptively valid." Perlstein v. Perlstein, supra, CT Page 9034152 Conn. 157. "It is not for this court to devise means of making marriage difficult. It our duty, however, to recognize the law as it exists." Hames v. Hames, supra. 163 Conn. 598. "It has long been clear that, under our laws, all authority to join parties in matrimony is basically secular." Carabetta v. Carabetta, supra, 182 Conn. 350. The policy of the law is strongly opposed to regarding an attempted marriage, such as that in this case, entered in good faith, believed by one or both of the parties to be legal, and followed by cohabitation, to be void. Id., 599. "As the state favors marriages for the reasons states, so the state does not favor divorces . . . The forms of the law of divorce should never by allowed to minister to the caprices of fickle minded persons, or to the revenges of the disappointed or vindictive; and least of all to the passions of the incontintent."Dennis v. Dennis, supra, 68 Conn. 197. Although the above quote from Chief Justice Andrews in Dennis is over 100 years old and prior to the advent of our current scheme of no fault divorce, as a public policy statement, it is currently applicable to the continued reluctance of Superior Court judges to grant decrees annulling marriages. This continues to be the public policy of this state. State v.Nosik, supra, 245 Conn. 201.
The court finds that if the parties claims are held valid, in such future cases a Superior Court must apply and interpret religious laws and rules. This case does not involve a tort, a property dispute nor involve the public policy of the state of Connecticut and/or its people. This case is a request to examine the internal workings of Episcopal Church canon law. This court will not apply canon law.
For the reasons stated the annulment requested in the first count of the plaintiff's complaint is denied.
This denial is without prejudice to the parties either presenting new evidence concerning the plaintiff's second count seeking a decree dissolving the marriage, or producing further evidence to establish any other grounds for annulment.
BY THE COURT KEVIN TIERNEY, JUDGE.