******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## VINCENT CIARLEGLIO *v.* MIRIAM MARTIN
### (AC 45535)

Elgo, Suarez and Seeley, Js.*

### *Syllabus*

The defendant appealed from the judgment of the trial court granting an annulment of her marriage to the decedent. The defendant claimed, inter alia, that the trial court lacked subject matter jurisdiction because the substitute plaintiff, the administrator of the decedent's estate, lacked standing to continue the annulment action after the decedent's death. *Held*:

The trial court did not lack subject matter jurisdiction over the action pursuant to statute (§ 52-599 (a)).

The exception set forth in § 52-599 (c) (1) was inapplicable to the circumstances presented by this case as the annulment action was not rendered useless by the death of the decedent, the administrator of his estate having had a legitimate fiduciary interest in establishing the identity of the rightful heirs as well as a duty to carry out the wishes of the decedent.

The plaintiff's continuation of the action to annul the marriage following the death of the decedent did not constitute an impermissible collateral attack on a legally valid marriage.

The defendant failed to preserve her claim, and induced any error, with respect to the applicable standard of proof and could not prevail under the plain error doctrine.

Argued January 8—officially released September 24, 2024

### *Procedural History*

Action for the dissolution or annulment of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven, where Steven M. Allinson, the administrator of the plaintiff's estate, was substituted as the plaintiff; thereafter, the matter was tried to the court, *Goodrow, J.*; judgment annulling the marriage, from which the defendant appealed to this court. *Affirmed.*

*Sean R. Caruthers*, for the appellant (defendant).

---

* Although Judge Suarez was not present at oral argument, he has read the briefs and appendices and listened to a recording of the oral argument prior to participating in this decision.

*Gregory A. Allen*, with whom were *Steven M. Allinson*, and, on the brief, *Kathleen S. Lima*, for the appellee (substitute plaintiff).

*Opinion*

ELGO, J. The defendant, Miriam Martin, appeals from the judgment of the trial court granting an annulment of her marriage to the decedent, Vincent Ciarleglio.[1] On appeal, the defendant claims that (1) the court lacked subject matter jurisdiction because the plaintiff lacked standing to continue the annulment action after the decedent's death, (2) the plaintiff's action to annul the marriage following the death of the decedent constituted an impermissible collateral attack on a legally valid marriage, and (3) the court held the plaintiff to an incorrect burden of proof when it granted the annulment. We affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to the defendant's claims. The parties obtained a marriage license on February 7, 2019, and were married later that day. At the time of the marriage, the decedent was eighty-two years old, and the defendant was fifty-two years old. The marriage ceremony was performed by a justice of the peace who was a

---

[1] Ciarleglio commenced the present action by service of process on June 21, 2019. He died shortly thereafter, on August 24, 2019, and a motion to substitute party was granted on January 5, 2021. A motion to amend the complaint subsequently was granted, resulting in the operative complaint improperly naming the "Estate of Vincent Ciarleglio" (estate) as the plaintiff. The parties do not contest that a scrivener's error occurred when the court improperly substituted the estate as the plaintiff instead of Steven M. Allinson in his capacity as the administrator thereof. See *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 32, 144 A.3d 420 (2016) ("An estate is not a legal entity. It is neither a natural nor artificial person, but is merely a name to indicate the sum total of the assets and liabilities of the decedent or incompetent. . . . Not having a legal existence, it can neither sue nor be sued." (Internal quotation marks omitted.)). For clarity, we refer to Ciarleglio as the decedent and to the administrator of his estate as the plaintiff in this opinion.

friend of the defendant and an acquaintance of the decedent. No family members were invited to or attended the ceremony. Two days before the defendant obtained the marriage license, the decedent underwent a surgical procedure and was suffering from numerous medical conditions. The decedent was hospitalized two days after the ceremony.

On May 22, 2019, the Probate Court appointed the decedent's niece as his conservator under a voluntary conservatorship. In June, 2019, the decedent met with an attorney to secure legal representation for a divorce or annulment and, on June 21, 2019, he commenced an action to dissolve or annul the marriage on the basis that he "was incompetent at [the] time of marriage." On July 8, 2019, the decedent's attorney filed numerous motions on his behalf, in which the decedent sought exclusive possession of his premises and the return of certain personal items. On July 22, 2019, the decedent's attorney filed a motion asking the court to enjoin the defendant from collecting rent on properties owned by the decedent. Both parties filed mandatory disclosure and production orders, and the defendant filed a motion for alimony pendente lite. Less than two months after this action commenced, the decedent died intestate on August 24, 2019.

On September 3, 2019, the defendant filed a motion to dismiss the action for lack of subject matter jurisdiction, asserting that the court was unable to grant any relief in the matter due to the decedent's death. Noting that the parties were married when the action commenced and relying on General Statutes § 52-599 (a), the court concluded that an annulment action does not abate upon the death of a plaintiff, unless there is no fiduciary in place to continue the litigation on behalf of the decedent.[2] Stating that it was unaware of any

---

[2] General Statutes § 52-599 (a) provides: "A cause or right of action shall not be lost or destroyed by the death of any person, but shall survive in favor of or against the executor or administrator of the deceased person."

fiduciary acting on behalf of the estate, the court granted the defendant's motion and dismissed the action without prejudice.

Less than one month later, the Probate Court appointed the plaintiff, Steven M. Allinson, as temporary administrator of the estate of the decedent, with broad authority "to deal with all aspects of the estate, including but not limited to lawsuits, finances, rents, custody of the remains, and any other matter the temporary administrator feels is necessary to fulfill his duties." On February 14, 2020, the plaintiff moved to open the judgment of dismissal and simultaneously moved to substitute the decedent's estate as party plaintiff "[i]n order to preserve any and all claims by the decedent."[3]

On November 30, 2020, the court granted the motion to open the judgment. The court thereafter held a hearing on the motion to substitute, which the defendant did not attend. Following the hearing, the court granted that motion.[4]

On February 8, 2021, the plaintiff filed a motion for permission to file an amended complaint, in which he sought an annulment of the marriage on the ground that it was void or voidable due to incompetence. The defendant objected, citing procedural defects in the motion to amend. The plaintiff then filed a second

[3] In his supplemental brief in support of the motion to substitute, the plaintiff argued that, because the annulment action affects not only the "legality of the marriage" but also "the division of property and other assets as well," the "interest of the parties in an annulment and the purpose of an annulment does not extinguish at the death of one of the parties and the action may survive by the executor." See *Perlstein* v. *Perlstein*, 26 Conn. Supp. 257, 258, 217 A.2d 481 (1966) ("[a] direct action to annul a marriage not only affects the status of the marriage itself but may also affect property rights arising from this status").

[4] As previously noted, the action continued under "Estate of Vincent Ciarleglio" due to a scrivener's error; see footnote 1 of this opinion; despite the order of the court granting substitution of the administrator.

motion to amend the complaint; after a hearing, the court granted the motion without objection.[5]

A trial was scheduled for April 25, 2022. Before trial, the plaintiff filed proposed orders requesting: "(1) The parties' marriage of February 7, 2019, shall be annulled and deemed void as of the date of its initiation, February 7, 2019, and the marriage be annulled; [and] (2) [a]ll issues regarding the estate of [the decedent] and finances in this matter shall be referred to the Hamden/ Bethany Probate Court for further proceedings consistent with the finding that the marriage between [the decedent] and [the defendant] was annulled and deemed void." A three day trial followed, at which both the defendant and the plaintiff were represented by counsel.

On May 9, 2022, the court issued a memorandum of decision, in which it found the following relevant facts: "The decedent was under medical care at the time the parties married, [had] uncontrolled diabetes and . . . was medically compromised with reduced blood flow. On February 5, 2019, two days before the marriage, the decedent was infused with fentanyl and Demerol so that his physician could search his upper bowels to determine the cause of his blood loss, dizziness, and general weakness. He was suffering from a defective heart, hypertension, heart valve failure, loss of blood to the brain, fainting and immune deficiency in addition to other illnesses. On February 7, 2019, the day of the marriage, the decedent was acutely ill, medically compromised and could not have made prudent decisions. He was suffering from numerous medical conditions,

---

[5] The defendant did not, at any time in the underlying action, raise an objection based on the plaintiff's lack of standing. Because standing implicates subject matter jurisdiction, which can be raised at any time, and the defendant asserts a colorable claim of lack of standing, we nevertheless consider her claim on appeal. See, e.g., *Kloiber* v. *Jellen*, 207 Conn. App. 616, 621–22, 263 A.3d 952 (2021).

including a seizure caused by a blood infection, blood loss and dizziness, weakness, chronic anemia, difficulty breathing, fever, kidney failure and the beginnings of liver failure. The kidney failure impacted the decedent's cognitive abilities and affected his competency and ability to comprehend and make decisions. He was not receiving sufficient oxygen to the brain. The court finds based on Dr. [Michael] Nelken's opinion that the decedent's body was 'poisoning his brain' for a period prior to the marriage."[6]

In its memorandum of decision, the court credited testimony from the decedent's niece that, during his February, 2019 hospitalization, the decedent told her that he was not married. She further testified that when she later presented him with the marriage license in early May, 2019, the following exchange took place: "At first he didn't know what I was showing him. And then I—I explained to him that it was a marriage license and that his signature was on the paper, the copy that I had.

---

[6] In finding those facts, the court credited the testimony of the plaintiff's expert witness, Nelken, an expert in the field of psychiatry who had reviewed the decedent's extensive medical records. The court found that Nelken "credibly testified that the decedent was medically compromised to such a degree on February 7, 2019, that he was not competent to make important decisions." Nelken's testimony included, inter alia, that just days prior to the ceremony, the decedent was suffering from twenty-eight separate medical conditions—these conditions, which were listed in Nelken's report, included prostate cancer, a blood infection, congestive heart failure, anemia, edema, gout, and numerous other heart problems. Additionally, just two days before the wedding ceremony, the decedent underwent a surgical procedure to investigate his blood loss and dizziness. The day after the ceremony, February 8, the decedent was advised to go to an emergency room—due to shortness of breath and the ongoing blood infection—but he did not go until the following day. When testing was done on February 8—one day after the ceremony—it revealed kidney failure. Kidney failure, Nelken opined, raises "questions about [the decedent's] competence" because "these kinds of results don't occur instantaneously." On February 9, the decedent was hospitalized for four days, and further testing revealed anemia—the inability of the blood to transmit oxygen—and blood infection. Nelken's report was admitted as a full exhibit and credited by the court.

And he just looked at me confused and he said, no, he goes, I didn't get married. And I said, well apparently you did because I have the license in front of me. And I was showing it to him. And all he said to me was, I was tricked."

On the basis of the medical records of the decedent's hospitalization on February 9, 2019, which were admitted into evidence, the court further found that the decedent "was panting, wheezing, had blood in his feces, swollen legs, a heart murmur, and kidney failure" and that he "refused to admit that he was experiencing any medical problems and denied any medical complaints, demonstrating confusion and inattention," from which the court inferred that "the decedent was not in touch with reality."

The court did not credit the testimony of the defendant or the witness who performed the ceremony. The court expressly found that "[t]heir testimony was inconsistent regarding the planning of the marriage and not credible considering the overwhelming weight of the evidence that the decedent was not competent to consent to the marriage." The defendant does not challenge the propriety of those findings on appeal.

In its memorandum of decision, the court stated that, although statutory prohibitions can render a marriage void, a lack of consent is a "substantive defect, derived from the common law, sufficient to avoid a marriage."[7] (Internal quotation marks omitted.) The court found

---

[7] On appeal, the defendant claims that "the trial court's memorandum of decision makes no distinction between a void marriage and a voidable marriage" and argues that the marriage at issue in this case was voidable, rather than void. The plaintiff, likewise, does not dispute that it sought an annulment of a voidable marriage on the basis of mental incapacity and that "[a]t no time did any party state [that the decedent] was statutorily incapacitated to the point that the marriage from the start was void." During closing arguments, the plaintiff's counsel explicitly argued that the decedent did not "properly enter into the contract of marriage."

that "the decedent was not competent to marry" on the basis of "[t]he overwhelming evidence" before it and concluded that "[t]he decedent did not possess at the time of the marriage on February 7, 2019, a sufficient mental capacity to understand and comprehend the consequences of the marriage or to consent to the marriage. He was medically and cognitively compromised to such a degree on February 7, 2019, that he was unable to consent to the marriage. Therefore, because the decedent was incapable of consenting to the marriage due to his insufficient mental capacity, the marriage is void." The court thus rendered judgment annulling the marriage of the decedent and the defendant, and this appeal followed.

I

The defendant first claims that the court lacked subject matter jurisdiction because the plaintiff lacked standing to continue the annulment action following the death of the decedent. More specifically, the defendant argues that § 52-599 does not grant standing to the administrator of an estate, when substituted in an annulment action initiated by a decedent plaintiff, because an exception set forth in subsection (c) of that statute applies to this scenario. Because standing is a threshold issue, we first address the question of whether the plaintiff is statutorily aggrieved under § 52-599.

The following legal principles are relevant to this claim. "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . . Standing is established by showing that the party claiming it is authorized by statute to bring an action, in

other words, statutorily aggrieved, or is classically aggrieved. . . . [Statutory] [s]tanding concerns the question [of] whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (Internal quotation marks omitted.) *Handsome, Inc.* v. *Planning & Zoning Commission*, 317 Conn. 515, 525, 119 A.3d 541 (2015).

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, 291 Conn. 789, 803, 970 A.2d 640 (2009).

In the present case, the plaintiff claims to be aggrieved pursuant to § 52-599 (a). To resolve that claim, we first consider whether such standing exists under the broad contours of the statute and then turn to the question of whether an exception set forth in § 52-599 (c) applies.

A

Section 52-599 sets out the circumstances under which an action interrupted by the death of a litigant shall be allowed to continue by substituting the executor or administrator of the estate in place of a deceased litigant. When presented with questions of statutory interpretation, we are guided by General Statutes § 1-2z, commonly known as the plain meaning rule, which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and

does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.”

The language of § 52-599 (a) is both broad and mandatory, providing that “[a] cause or right of action shall not be lost or destroyed by the death of any person, but shall survive in favor of or against the executor or administrator of the deceased person.” Substitution in this manner can cure a jurisdictional defect, which is the precise purpose of § 52-599.[8] “The phrase right of action includes the right to commence and maintain an action.” (Internal quotation marks omitted.) *Hayes* v. *Smith*, 194 Conn. 52, 62, 480 A.2d 425 (1984).

Both principles of equity and judicial precedent support the proposition that the administrator of an estate properly may maintain an annulment action initiated by a decedent plaintiff. Although there is no clear precedent establishing that an annulment action, initiated prior to the death of a party, can proceed under § 52-599, we note that, as a general principle, “[o]ur rules of practice . . . permit the substitution of parties as the interests of justice require.” *Federal Deposit Ins. Corp.* v. *Retirement Management Group, Inc.*, 31 Conn. App. 80, 84, 623 A.2d 517, cert. denied, 226 Conn. 908, 625 A.2d 1378 (1993); see also General Statutes §§ 52-107, 52-108 and 52-109; Practice Book §§ 9-18 and 9-19. The rules permitting the substitution of parties as the interests of justice require “are to be construed so as to alter the harsh and inefficient result that attached to the mispleading of parties at common law.” (Internal quotation marks omitted.) *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 212 Conn. App. 339, 372

---

[8] Discussing the substitution of an administrator of an estate for a conservator who had brought various tort actions on behalf of a plaintiff who died prior to judgment, our Supreme Court noted that any potential jurisdictional defect was cured by the substitution of the administrator of the estate. *Kortner* v. *Martise*, 312 Conn. 1, 10–11, 91 A.3d 412 (2014).

n.24, 275 A.3d 639, cert. denied, 343 Conn. 933, 276 A.3d 974 (2022).

Alongside these guiding principles, we also have guidance from our Supreme Court, which, as this court previously has noted, "has described § 52-599 as having a broad sweep and that the *only* exceptions to its application are those set forth in § 52-599 (c): (1) . . . any cause or right of action or . . . any civil action or proceeding the purpose or object of which is defeated or rendered useless by the death of any party thereto, (2) . . . any civil action or proceeding whose prosecution or defense depends upon the continued existence of the persons who are plaintiffs or defendants, or (3) . . . any civil action upon a penal statute." (Emphasis in original; internal quotation marks omitted.) *In re David B.*, 167 Conn. App. 428, 442, 142 A.3d 1277 (2016).

It is also a long-standing principle that, because marriage is of vital social importance, "any question touching its dissolution should be passed upon with that fact and the interests of the [s]tate and society in view . . . ." *Lyman* v. *Lyman*, 90 Conn. 399, 411, 97 A. 312 (1916); see also *Boddie* v. *Connecticut*, 401 U.S. 371, 376, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971) ("marriage involves interests of basic importance in our society"). There is a strong presumption of validity for marriage, as "[t]he policy of the law is strongly opposed to regarding an attempted marriage . . . entered into in good faith, believed by one or both of the parties to be legal, and followed by cohabitation, to be void." *Hames* v. *Hames*, 163 Conn. 588, 599, 316 A.2d 379 (1972).

In the present case, the defendant asks us to rule that the death of a party seeking an annulment would *automatically* validate the very same marriage that is being challenged as invalid. Given the broad and mandatory language of § 52-599, we cannot agree.

Our Supreme Court has held that the administrator of an estate has, by virtue of the survival statute, and rooted in common law, "the right and duty to recover or clear title to real property when the estate is insolvent." *Miner* v. *Miner*, 137 Conn. 642, 647, 80 A.2d 512 (1951). In *Miner*, the administrator of an estate continued a quiet title action initiated by a decedent plaintiff; id., 643–44; although the legal title may have been with the heirs or devisees.[9] Id., 647; see also *Poglitsch* v. *Camp Bethel Assn., Inc.*, Docket No. CV-19-6018358-S, 2021 WL 1400927, *9 (Conn. Super. March 1, 2021) ("[t]he court concludes that § 52-599, which does not place any limit on the type of action that may survive upon substitution of an executor, operates so as to provide statutory aggrievement to an executor or administrator to continue pursuit of a quiet title action commenced prior to the death of a testator").

Conversely, our courts have prohibited substitution in cases where specific relief was sought, such as an injunction for specific performance. See *Groton* v. *Commission on Human Rights & Opportunities*, 169 Conn. 89, 100–101, 362 A.2d 1359 (1975). Determination of paternity, a proceeding instituted to ascertain a relationship or status between persons, was held to be purely "personal to the parties." (Internal quotation marks omitted.) *Hayes* v. *Smith*, supra, 194 Conn. 62.

In the present case, the plaintiff proposed orders relating to the court's division of the estate. The plaintiff

---

[9] In *Miner*, our Supreme Court applied General Statutes (1949 Rev.) § 8337, the predecessor to § 52-599, in determining that the trial court possessed subject matter jurisdiction. See *Miner* v. *Miner*, supra, 137 Conn. 646–47. Connecticut has had similar statutes in place since at least 1903. See *Pickett* v. *Ruickoldt*, 91 Conn. 680, 683, 101 A. 82 (1917) ("[u]nder [the Survival Act of 1903] the survival of actions is the rule and not the exception, and the presumption is that every cause or right of action survives until the contrary is made to appear by way of exception to the rule").

cites the "significant financial implications" of an annul-ment, given that the decedent died intestate. The defen-dant likewise acknowledges that the granting of an annulment "stripped" her of "the rights and benefits that she enjoyed as a married person" despite the death of the decedent.

Given that there was sufficient purpose to continue the annulment action, as conceded by the defendant's own characterization of the situation and supported by established precedent, we conclude that the administra-tor of the estate of a decedent plaintiff is statutorily aggrieved and, thus, has standing to continue an annul-ment action under § 52-599 (a).

B

We turn next to the question of whether the exception set forth in § 52-599 (c) (1) applies in this case. We conclude that it does not.

Section 52-599 (c) (1) provides: "The provisions of this section shall not apply . . . [t]o any cause or right of action or to any civil action or proceeding the purpose or object of which is defeated or rendered useless by the death of any party thereto . . . ." The defendant claims that § 52-599 (c) (1) applies in the present case, arguing that the action seeking annulment is rendered useless or absurd because "the very same second the motion to open [would be] granted, General Statutes § 46b-40 would immediately operate to dissolve the marriage." Section 46b-40 provides in relevant part: "(a) A marriage is dissolved only by (1) the death of one of the parties or (2) a decree of annulment or dissolution of the marriage by a court of competent jurisdiction. (b) An annulment shall be granted if the marriage is void or voidable under the laws of this state or of the state in which the marriage was performed. . . ." The defendant contends that, by allowing an annulment action to continue under the survival statute, the court

effectively reinstated a marriage that already had dissolved upon the death of one of the parties. Because we do not read the statute to compel that result, we cannot agree with the defendant.

The broad application of § 52-599 mandated by our Supreme Court; see *Foisie* v. *Foisie*, 335 Conn. 525, 532, 239 A.3d 1198 (2020); *In re David B.*, supra, 167 Conn. App. 442; informs our analysis of the exceptions contained therein. There is a general policy favoring "the continuation and timely resolution of actions on the merits whenever possible." *In re David B.*, supra, 442. As this court previously has observed, when a party seeks to substitute the administrator of the estate of a deceased plaintiff, the applicability of § 52-599 can reasonably be construed to extend to those civil cases in which, despite the death of the plaintiff, "the continuation of the litigation arguably could benefit the decedent's estate, typically in some pecuniary manner . . . ." Id., 446. Where the value of the estate is at issue, causes of action have been allowed to be continued by the administrator of the estate because the substitution would "do no more than enhance or diminish the estate the same as it would have enhanced or diminished the deceased [party's] assets if he had lived." *Foisie* v. *Foisie*, supra, 542.

In considering the applicability of § 52-599 to an action to annul a marriage, we note that, because property rights attach to the status of marriage, an action to annul not only seeks to affect the status of the marriage itself, but also those attendant property rights. The defendant acknowledges as much, arguing that "[t]he trial court's decision not only invalidated the parties' marriage, but it also stripped [the defendant] of the rights and benefits that she enjoyed as a married person." It is clear that, upon the death of a party seeking an annulment, especially when that party dies intestate,

the purpose of the underlying action becomes heightened—not useless. See *Perlstein* v. *Perlstein*, 26 Conn. Supp. 257, 258, 217 A.2d 481 (1966) (noting that, under § 52-599, action to annul marriage was not rendered useless upon death of plaintiff). This is particularly so in this case where the decedent, prior to his death, took action to protect his assets by seeking exclusive possession of the premises, the return of personal items, and to enjoin the defendant from collecting rent on his properties.

In arguing that the continuation of an annulment action effectively seeks to reinstate an already dissolved marriage, the defendant mischaracterizes the holding of our Supreme Court in *Foisie* v. *Foisie*, supra, 335 Conn. 525. She contends that, pursuant to § 46b-40, the Supreme Court "expressly prohibit[ed]" the trial court's reopening of the judgment in that case because "[t]he party's death would defeat and render useless the motion [seeking to alter marital status], because, once granted, the reinstated marriage would automatically be dissolved as of the date of the deceased party's death . . . ." The defendant is mistaken, as the court in *Foisie* considered—and rejected—the argument that every motion to open, if granted, would effectively reinstate a marriage, even if one of the parties had died during the pendency of the action. See *Foisie* v. *Foisie*, supra, 537.[10] In concluding that the trial court in that case

[10] Trial courts also have opened dissolution judgments for the limited purpose of reconsidering financial orders with the stipulation of the parties. See *Reinke* v. *Sing*, 186 Conn. App. 665, 667 n.1, 201 A.3d 404 (2018); see also *Lavy* v. *Lavy*, 190 Conn. App. 186, 192, 210 A.3d 98 (2019) (parties agreed to have court open dissolution judgment for purpose of conducting limited discovery related to fraud claims). Here, the defendant did not object to the motion to open the judgment nor the motion to substitute a party. This is the functional equivalent of a stipulation to open the judgment for a limited purpose, which was also operative in *Foisie*. The defendant's claim of lack of subject matter jurisdiction does not erase the underlying procedural history.

erred in determining that a motion to open a dissolution judgment would automatically reinstate the marriage, triggering § 46b-40 and immediately dissolving it, our Supreme Court held that the determination of the issue turned on the relief requested in the motion to open.[11] Id., 536.

In the present case, the relief sought was an annulment, and not the reinstatement, of a marriage. Although the defendant's theory may be compelling if the sole relief being sought by the motion to open was reinstatement of the marriage, it would be absurd to demand that an action for annulment requires the reinstatement of a marriage in order to void it. Here, as in *Foisie*, the plaintiff was not attempting to have the marriage reinstated. See id., 537. Indeed, the plaintiff had moved to open the annulment action that had been commenced by the decedent, who had taken steps to protect his assets, and, on his death, the plaintiff duly moved to protect the decedent's estate.

Because the administrator of the estate has a legitimate fiduciary interest in establishing the identity of the rightful heirs, as well as a duty to carry out the wishes of the decedent, it is only logical that he be permitted to continue an action to annul a marriage under the circumstances presented by this case.

We therefore conclude that the purpose of the cause of action originally pursued by the decedent was not defeated or rendered useless by his death. Accordingly, the exception set forth in § 52-599 (c) (1) does not apply in this case.

---

[11] As our Supreme Court stated, "[a]lthough a motion to open, if granted, may vacate the dissolution of the marriage and thereby reinstate the marriage, that does not mean that the granting of every motion to open necessarily vacates the dissolution of the marriage. Not every motion to open *seeks* to vacate the dissolution of the marriage." (Emphasis in original.) *Foisie* v. *Foisie*, supra, 335 Conn. 537.

## II

We next address the defendant's claim that, because the marriage was voidable based on a claim of lack of mental capacity, the decedent's failure to "act" on his annulment prior to his death operates as a waiver of the voidable defect and abates upon his death. In other words, because the marriage was voidable, it remained legally valid until it was automatically dissolved upon the decedent's death pursuant to § 46b-40 (a). The defendant therefore argues that the plaintiff's action to annul the marriage following the death of the decedent constitutes an impermissible collateral attack on a legally valid marriage.[12]

Whether the plaintiff's action to annul the marriage following the death of the decedent constitutes an impermissible collateral attack on a legally valid marriage presents a question of law over which our review is plenary. "Because our review is plenary, we must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Karen* v. *Loftus*, 210 Conn. App. 289, 297, 270 A.3d 126 (2022).

On appeal, the defendant contends that, if a party does not "act [to obtain] an annulment from a court of

[12] Although we agree with the defendant that the operative complaint seeks to annul a voidable marriage, we do not read the trial court's memorandum of decision as necessarily differing from that premise. We reiterate that both parties do not dispute that an annulment may be granted for either voidable or void marriages, which, if granted, in either case would result in a judgment that the marriage was void. Because the defendant raised her lack of standing claim for the first time on appeal, which is also premised on her contention that a voidable marriage dissolves upon death, the court had no occasion to determine the legal status of the marriage as being either voidable or void prior to rendering judgment. Against that backdrop, the court's finding and conclusion that, because "the decedent was incapable of consenting to the marriage due to his insufficient mental capacity, the marriage is void" appears to represent the court's judgment that the marriage is void based on those findings and pursuant to the relief sought.

competent jurisdiction prior to the death of one of the parties, the voidable defect is deemed waived and will abate with the death of a party." We do not agree.

As our Supreme Court has explained, "[i]n the absence of express language in the governing statute declaring a marriage void for failure to observe a statutory requirement, this court has held in an unbroken line of cases since *Gould* v. *Gould*, 78 Conn. 242, 247, 61 A. 604 (1905), that such a marriage, though imperfect, is dissoluble rather than void. *Hames* v. *Hames*, supra, [163 Conn.] 598; *Perlstein* v. *Perlstein*, 152 Conn. 152, 157–58, 204 A.2d 909 (1964); *Vendetto* v. *Vendetto*, 115 Conn. 303, 305, 161 A. 392 (1932)." *Carabetta* v. *Carabetta*, 182 Conn. 344, 349, 438 A.2d 109 (1980).

At the same time, "[w]e recognize that an annulment and a dissolution of marriage differ fundamentally. An annulment renders the marriage void ab initio while a dissolution is based upon a valid marriage which terminates as of the date of the judgment of dissolution." *Durham* v. *Miceli*, 15 Conn. App. 96, 96, 543 A.2d 286 (1988).

By statute, an annulment must be granted if the marriage is either void or voidable under the laws of this state or of the state in which the marriage was performed.[13] Section 46b-40 (a) provides that "[a] marriage is dissolved only by (1) the death of one of the parties or (2) a decree of annulment or dissolution of the marriage by a court of competent jurisdiction." Subsection (b) of § 46b-40 further provides: "An annulment shall be granted if the marriage is void or voidable under the laws of this state or of the state in which the marriage was performed."

[13] We note that our General Assembly could have prohibited the issuance of an annulment after the death of one of the parties as other jurisdictions have done, but it has not elected to do so. See, e.g., Wis. Stat. § 767.313 (2) (2009) ("A judicial proceeding is required to annul a marriage. A marriage may not be annulled after the death of a party to the marriage.").

Our modern statutory construction of § 46b-40 supports the distinction between annulment and dissolution and provides for annulments, in equity, to be granted simply when "void or voidable." Here, the plaintiff commenced an action to annul the parties' marriage but died before a decree of annulment could be issued by the court. Had the plaintiff not commenced that action, there can be little dispute that § 46b-40 (a) would have operated to dissolve the marriage upon his death. However, the defendant's contention that the court erred because the plaintiff did not "act [to obtain] an annulment" prior to his death and therefore waived the voidable defect suffers from a false premise. By commencing the action in the first place, the plaintiff did act to obtain an annulment. That he died before the action was concluded does not obviate that undisputed fact. We are thus hard-pressed to conclude that the voidable defect must be deemed waived in the circumstances presented by this case.[14]

Put differently, § 46b-40 (a) does not set up a race between two different actions—it sets up an alternative, and legally distinct, avenue to effect the dissolution of a marriage. In light of the foregoing, we conclude that the plaintiff's action to annul the marriage following the death of the decedent did not constitute an impermissible collateral attack on a legally valid marriage.

### III

The defendant also claims that the court held the plaintiff to an incorrect standard of proof—a preponderance of the evidence—when the appropriate standard was clear and convincing evidence. The defendant argues that this claim is properly preserved but that, in

---

[14] Indeed, the court, in ruling on the motion to dismiss, recognized that the circumstances warranted granting the motion without prejudice and implicitly acknowledged that the action could be revived if a fiduciary was appointed to continue the litigation pursuant to § 52-599.

the alternative, we should apply the plain error doctrine. We disagree with both contentions.

"The question of whether a trial court has held a party to a less exacting standard of proof than the law requires is a legal one. . . . Accordingly, our review is plenary." (Internal question marks omitted.) *In re Denzel W.*, 225 Conn App. 354, 372, 315 A.3d 346, cert. denied, 349 Conn. 918, 317 A.3d 1 (2024). When determining whether an issue is properly preserved, "[i]t is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Emphasis in original; internal quotation marks omitted.) *Downing* v. *Dragone*, 216 Conn. App. 306, 327, 285 A.3d 59 (2022), cert. denied, 346 Conn. 903, 287 A.3d 601 (2023).

Moreover, Practice Book § 5-2 provides in relevant part: "Any party intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief . . . or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. If the party fails to do this, the judicial authority will be under no obligation to decide the question."

The record reveals that, on the second day of trial, the court sua sponte raised the issue of the applicable

standard of proof. The court stated: "It is this court's view that the standard of proof which the plaintiff must meet is proof by a preponderance of the evidence. I recognize that other trial courts in the past have applied the clear and convincing evidence standard. I am aware of no Appellate or Supreme Court case [subsequent to] the enactment of the annulment statute which squarely addresses the issue.

"The court concluded in a prior case that the preponderance of the evidence standard is appropriate based upon statutory construction in that the annulment statute is silent as to the applicable standard. And, therefore, the court is required to apply the less stringent standard of preponderance of the evidence." The plaintiff's counsel concurred, and then the following colloquy ensued:

"The Court: And, [Defendant's Counsel], if you disagree with that analysis, I would ask you to, as soon as possible, bring to the court's attention some authority to the contrary.

"[The Defendant's Counsel]: Your Honor, I—I believe that your research is superior to mine. And I defer to your best judgment in that regard.

"The Court: Thank you for that . . . . I'll share with counsel that this was one of the very first issues that I had to address when I first began family matters . . . ."

Throughout the remainder of the trial, the defendant did not raise an issue regarding the applicable standard of proof nor file a posttrial motion to allow the court an opportunity to address the claim. In its memorandum of decision, the court applied the preponderance of the evidence standard, citing precedent and basic principles of statutory interpretation.[15] The defendant now

---

[15] The court noted that it was the plaintiff's burden to establish the basis for an annulment and that "the court must adhere to the language of the statute. When a statute is silent regarding the standard of proof [to apply to the evidence], the court must apply the preponderance of the evidence standard. *Stuart* v. *Stuart*, 297 Conn. 26, 34–35, 996 A.2d 259 (2010)."

claims, for the first time on appeal, that the court applied an incorrect standard of proof.

The defendant acknowledges that she did not distinctly raise this claim of error before the trial court. She nonetheless claims that the "ultimate purpose of issue preservation" was achieved by the on the record statement by the court. The defendant quotes *Overley* v. *Overley*, 209 Conn. App. 504, 268 A.3d 691 (2021), cert. denied, 343 Conn. 901, 272 A.3d 657 (2022), for the proposition that "because the sine qua non of preservation is fair notice to the trial court . . . the determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of *that very same claim*." (Emphasis added; internal quotation marks omitted.) Id., 513.

The defendant overlooks the undisputed fact that the court invited the defendant to provide it with any contrary arguments or authority "as soon as possible." The defendant's counsel declined to do so, stating: "Your Honor, I—I believe that your research is superior to mine. And I defer to your best judgment in that regard."[16] Moreover, in her appellate brief, the defendant concedes that there is an "absence of any binding [appellate] authority" on that legal issue.

---

[16] We note that the doctrine of induced error is implicated in the present case. "[T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the [allegedly] erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional error and induced constitutional error. . . . The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party. . . . [W]hether we call it induced error, encouraged error, waiver, or abandonment, the result—that the . . . claim is unreviewable—is the same." (Internal quotation marks omitted.) *Boone* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 335 Conn. 547, 567–68, 239 A.3d 1175 (2020). To the extent that the defendant declined to furnish any legal authority to the court and expressly indicated that she

Although it is true that the issue of the proper standard of proof was briefly discussed by the court at trial, the defendant declined the court's invitation to weigh in on that issue and voiced no objection to the court's conclusion that the applicable legal standard was the preponderance of the evidence standard. Rather, she affirmatively deferred to the court on that issue and did not raise any objection until this appeal.

Allowing the defendant to now raise the issue after deferring to the court's "best judgment" and forgoing the opportunities she previously had to address it "would be sanctioning trial by ambush, which we have repeatedly stated we will not allow." *In re David B.*, supra, 167 Conn. App. 444. Accordingly, we conclude that the defendant failed to preserve her claim, and induced any error, with respect to the applicable standard of proof.

In the alternative, the defendant submits that the plain error doctrine should apply. "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . [P]lain error review is reserved for only the most egregious errors. When an error of such a magnitude exists, it necessitates reversal." (Citation omitted; internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 813–14, 155 A.3d 209 (2017). "An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually

would defer to the court's "superior" research and "best judgment" on the issue of the applicable standard of proof, she induced the error of which she now complains.

adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 812.

We conclude that the defendant has not satisfied that burden. At trial, the court explained that it had concluded "in a prior case that the preponderance of the evidence standard is [the] appropriate" legal standard for claims involving § 46b-40. The court also acknowledged the lack of appellate authority on that issue. Moreover, in deciding to apply the preponderance of the evidence standard, the court expressly relied on *Stuart* v. *Stuart*, 297 Conn. 26, 38–40, 996 A.2d 259 (2010).

The defendant's burden under the first prong of the plain error doctrine requires proof of "an error so obvious on its face that it is undebatable." *State* v. *McClain*, supra, 324 Conn. 820 n.13. On the basis of the record before us, we conclude that the defendant has not met that burden. She therefore cannot prevail under the plain error doctrine.

The judgment is affirmed.

In this opinion the other judges concurred.